[Civ. No. 12059. Third Dist. Apr. 13, 1970.]

CALIFORNIA STATE EMPLOYEES' ASSOCIATION et al.,
Plaintiffs and Appellants, v.
SPENCER WILLIAMS, as Administrator, etc., et al.,
Defendants and Respondents.

## COUNSEL

Wilmer W. Morse for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, Robert Burton, Deputy Attorney General, Evans, Jackson & Kennedy, Hassard, Bonnington, Rogers & Huber, Howard Hassard, David E. Willett, Musick, Peeler & Garrett, James E. Ludham, Thomas M. Collins, Huovinen & White and Joseph T. White, Jr., for Defendants and Respondents.

## OPINION

**FRIEDMAN, Acting P. J.**—The issue here is whether statutes and a contract calling for the conduct of administrative tasks of the state's Medi-Cal program by private carriers violate article XXIV, the civil service amendment of the state Constitution.

Several California decisions hold that this provision inhibits "contracting out" state activities or tasks to private firms or persons. (*Burum* v. *State Comp. Ins. Funds* (1947) 30 Cal.2d 575 [184 P.2d 505]; *State Comp. Ins. Fund* v. *Riley* (1937) 9 Cal.2d 126 [69 P.2d 985, 111 A.L.R. 1503]; *Stockburger* v. *Riley* (1937) 21 Cal.App.2d 165 [68 P.2d 741].) Plaintiffs, the California State Employees' Association and two taxpayers, contend that the contract in question is thus illegal and entails illegal expenditures from the state treasury. They seek to enjoin these expenditures. They appeal from an adverse judgment after the trial court sustained defense demurrers.

Defendants are the administrator of the Medi-Cal agency, the State Controller and the three contracting carriers (California Physicians' Service, Hospital Service of California and Hospital Service of Southern California). At the inception of this lawsuit defendant Spencer Williams was the Administrator of the Health and Welfare Agency in the state government. The Medi-Cal program is presently administered by the Director and the Department of Health Care Services. (Welf. & Inst. Code, §§ 14061-14062, 14100.1.)

The Medi-Cal program, a system of medical aid to the needy, was instituted under the authority of 1965 legislation and first went into operation on March 1, 1966. The legislation (Welf. & Inst. Code, § 14000 et seq.) includes provisions looking to the partial conduct of the program's administrative tasks by nongovernmental carriers of health service programs, such as insurance companies or medical groups.[1] Under these provisions the Medi-Cal agency in February 1966 entered into an agreement with the three corporate defendants, contracting jointly as a single contractor. In effect the agreement notes their qualifications as "carriers;" calls upon the contractor to receive all invoices for health services dispensed under the program, to pay accepted invoices, to reject improper or fraudulent claims, to maintain liaison with health providers, to assist in the development of safeguards and procedures, to maintain records and furnish reports; calls upon the state to establish the eligibility of persons seeking medical care and to furnish these persons with identification; requires the state to provide funds for disbursement and to pay for the contractor's administrative services at a specified rate. The agreement was to expire at the end of December 1966 but could be renewed indefinitely, subject to termination upon notice.

---

[1]Welfare and Institutions Code, section 14000, provides in part:

". . . It is intended that whenever possible and feasible:

"(a) Such care shall, to the extent feasible, be provided through a system of prepaid health care or contracts with carriers.

"(b) The means employed shall be such as to allow eligible persons to secure health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability."

Welfare and Institutions Code, section 14104, provides in part:

"(a) The department shall, to the extent feasible, contract with one or more carriers to provide or arrange services through health benefits plans.

"(b) The department shall, to the extent feasible, enter into nonexclusive contracts providing arrangements under which funds available for health care under this chapter shall be administered and disbursed to providers of health care or to their designated agents in consideration for services rendered and supplies furnished by them in accordance with the provisions of the applicable contract and any schedule of charges or formula for determining payments established pursuant to such contract. . . ."

Welfare and Institutions Code, section 14057, provides in part:

" 'Carrier' means a private insurance company . . . , a medical society or other medical group, an association of insurers . . . , a nonprofit hospital service plan . . . , or nonprofit membership corporation, or health benefits plan administered by or through such corporation . . . , which is lawfully engaged in providing, arranging, paying for, or reimbursing the cost of personal health services under insurance policies or contracts, medical and hospital service agreements, membership contracts, county hospital system or the state fund, in consideration of premiums or other periodic charges payable to it."

In the interest of brevity, we have refrained from quoting additional portions of section 14104, *supra,* which call for the award of contracts to carriers upon bid and fix mandatory and optional features of the contracts.

The complaint for injunction incorporates a copy of the challenged contract. It alleges that the contract has been renewed and is currently in operation; that the contractor has employed on a permanent basis numerous clerical personnel, auditors, investigators and administrators to perform the agreed work; that these persons are not civil service employees of the state; that the tasks performed by them are permanent and of the same character as those performed by civil service employees; that the authorizing statutes and the contract violate article XXIV of the state Constitution.

■ The trial court erroneously sustained general and jurisdictional demurrers on the ground that plaintiffs had failed to exhaust administrative remedies before suit. ■ Of course, the general rule denies jurisdiction to grant judicial relief where the applicant has failed to exhaust an administrative remedy provided by law. ■ The trial court viewed Government Code, section 18670, as the source of an administrative remedy which plaintiffs had bypassed.

Section 18670 is one of several laws which invest the State Personnel Board with investigatory and enforcement powers.[2] These provisions empower the board to review and rectify the actions of employee-appointing powers which conflict with the civil service laws. (*Ferdig* v. *State Personnel Board* (1969) 71 Cal.2d 96, 105-107 [77 Cal.Rptr. 224, 453 P.2d 728].)

[2]Article XXIV, section 3, of the state Constitution declares that the Personnel Board "shall administer and enforce" the civil service laws.

Government Code section 18670 provides:

"The board may hold hearings and make investigations concerning all matters relating to the enforcement and effect of this part and rules prescribed hereunder. It may inspect any State institution, office, or other place of employment affected by this part to ascertain whether this part and the board rules are obeyed.

"The board shall make investigations and hold hearings at the direction of the Governor or the Legislature or upon the petition of an employee or a citizen concerning the enforcement and effect of this part and to enforce the observance of the provisions of Article XXIV of the Constitution and of this part and the rules made hereunder."

Government Code section 18710 provides:

"All orders and decisions of the board made pursuant to Article XXIV of the State Constitution or this part shall be obeyed by and are binding upon appointing powers and employees.

"If any appointing power refuses or neglects to comply with any such order or decision, the board may issue an order to show cause, directed to such appointing power, why the board should not file a petition for a writ of mandate to compel such appointing power to comply with such order or decision.

"If the board finds that no good cause exists for the refusal or neglect of the appointing power to comply with such order or decision, the board shall file a petition for a writ of mandate in the manner and in the court provided for by law to compel such appointing power to comply with such order or decision.

"This procedure for the enforcement of the orders and decisions of the board is in addition to any other means or procedure which may be provided by law."

They do not empower the board to adjudicate the contractual status of the defendant carriers or to intercept their payments from the state treasury. Plaintiff taxpayers have standing to maintain an equity suit to enjoin allegedly illegal expenditures. (*Ahlgren* v. *Carr* (1962) 209 Cal.App.2d 248, 252-254 [25 Cal.Rptr. 887].) The real target of such a suit is the State Controller, who is constitutionally designated to draw warrants on the state treasury. (Cal. Const., art. XIII, § 21.) The taxpayers' standing is not impaired by a concurrent power of the State Personnel Board to investigate the same charge of illegality. The board's supervisory and investigative power does not rise to the level of an "administrative remedy" for solution of the taxpayers' grievance. (*Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559, 566-567 [55 Cal.Rptr. 505, 421 P.2d 697].)

Despite the trial court's erroneous ruling, the judgment will not be reversed if the demurrer should have been sustained upon any of the grounds urged. (*Stowe* v. *Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 424 [282 P.2d 890].) Absence of any collision with the constitutional civil service provision was a separate ground urged in support of defendants' general demurrers. We turn to that issue.

Article XXIV of the state Constitution, adopted in 1934, provides for permanent appointments and promotions in the state civil service "based upon merit, efficiency and fitness as ascertained by competitive examination;" delegates administration to the State Personnel Board and declares that the state civil service shall embrace "every officer and employee of [the] State," subject to 16 specified exemptions. The constitutional provision is implemented by the state Civil Service Act. (Gov. Code, § 18500 et seq.)

Civil service coverage restricts but does not prohibit the performance of government work by independent contractors. In measuring the space left for service contracts, the California Supreme Court has evolved two separate formulae or tests. In cases involving contracts of state agencies the court has articulated the following test: " 'There undoubtedly is a field in which state agencies may enter into contracts with independent contractors. But the true test is not whether the person is an "independent contractor" or an "employee," but whether the services contracted for, whether temporary or permanent, are of such a nature that they could be performed by one selected under the provisions of civil service. If the services could be so performed then in our opinion it is mandatory upon such appointing power to proceed in accordance with the provisions of the Constitution and statute above summarized. . . .' " (*Burum* v. *State Comp. Ins. Fund, supra,* 30 Cal.2d at p. 580, quoting from *State Comp. Ins. Fund* v. *Riley, supra,* 9 Cal.2d at p. 135.)

Both the *State Compensation Insurance Fund* decisions left room for contract services which cannot be "adequately or competently or satisfactorily" performed by civil service personnel. (*Burum* v. *State Comp. Ins. Fund, supra,* 30 Cal.2d at p. 582.) In both cases the state agency was performing its ongoing function when it hired a contractor to perform a task or exercise an occupational skill within the scope of that function. Thus the "nature of the services" test was conceived in terms of job task or skill. The test involves an inquiry whether persons performing tasks or exercising skills under the contract are or can be employed through civil service methods.[3]

The charter of San Francisco imposes civil service coverage comparable to that of article XXIV. In *San Francisco* v. *Boyd* (1941) 17 Cal.2d 606 [110 P.2d 1036], and *Kennedy* v. *Ross* (1946) 28 Cal.2d 569 [170 P.2d 904], the court held that contracts retaining expert engineering consultants did not impair that coverage. Each consultant was to hire his own staff. Significantly, the *Kennedy* case declares (28 Cal.2d at p. 573): ". . . Here the conclusion must be that the petitioner and his assistants do not by the contract become city employees in either permanent or temporary positions in the sense intended by the charter provisions. They are therefore not subject to classified civil service . . . .

"The foregoing conclusion is based on the assumption that the engagement outside the list of eligibles otherwise is legal and that the services for which the petitioner was engaged are not such as could adequately be rendered by an existing department of the city. . . . It was held in the Boyd case and recognized in the Rily [*sic*] case that the appropriate agency is empowered in proper cases to engage the services of an expert in a field covered by an existing department without a resulting illegal duplication of the functions and duties of existing officers and departments."

Thus the *Kennedy* case makes a functional inquiry rather than one fo-

---

[3]Whatever may have been the efficacy of the "nature of the services" test when it was conceived in 1937, it is now evident that rigid application of that test would lead to untoward and possibly chaotic results. Theoretically, it might bar payment of a bill for lubricating a state car which could have been lubricated by employees in a state garage; prevent repair of an office machine by a dealer's serviceman rather than the state's equipment maintenance personnel; bar an office remodeling contract because the state has a staff of construction craft workers and can hire more; forbid an architectural design contest for a noteworthy public building; prevent the retainer of independent scientific consultants whose skills are matched by state-employed scientists. Certainly, the "nature of the services" formula seems simplistic and inadequate when viewed in relation to modern techniques of public administration, which frequently involve the government in indirect rather than direct administrative operations. (See *infra.*) Conceivably, many service contracts are approved and paid only by administrative liberality in concluding that civil service personnel cannot "adequately or competently or satisfactorily" perform the particular tasks.

cused on occupational tasks or skills. To paraphrase *Kennedy,* if the services cannot be adequately rendered by an existing agency of the public entity or if they do not duplicate functions of an existing agency, the contract is permissible. The two *State Compensation Insurance Fund* cases formulate the test in terms of individual taks or skills, the two San Francisco decisions in terms of agency function.

Variant results are possible by utilizing one or another of these tests. The present contract calls for tasks or skills such as tabulation, compilation, audit, disbursement and office management. These tasks duplicate those routinely performed in civil service agencies throughout the state government. Applied literally, "the nature of the services" test formulated in the *State Compensation Insurance Fund* decisions would void the contract. In contrast, the functional test enumerated in the San Francisco cases tends to sustain the contract, which calls for a function not performed by any existing agency of the state government.

An arbitrary choice between these tests hardly serves the purpose of constitutional adjudication. Nor does *stare decisis* compel rigid adherence to the formula enunciated in the *State Compensation Insurance Fund* decisions in preference to the functional test posed by *Kennedy* v. *Ross, supra.* Neither of the *State Compensation Insurance Fund* decisions considered lawfulness of the contractual performance of a new state function.    ■    A decision is not authority for propositions not considered. (*Fricker* v. *Uddo & Taormino Co.* (1957) 48 Cal.2d 696, 701 [312 P.2d 1085].) Article XXIV and the San Francisco Charter call for comparable civil service coverage and both express the same underlying policy. The restriction on "contracting out" does not stem from an express constitutional prohibition. Rather, it emanates from an implicit necessity for protecting the policy of the organic civil service mandate against dissolution and destruction. (*State Comp. Ins. Fund* v. *Riley, supra,* 9 Cal.2d at pp. 135-136.) By permitting contract services which do not duplicate existing agency functions, *Kennedy* v. *Ross* emphasizes protection of the existing civil service structure as the central policy aim.

Plaintiffs' argument goes beyond protection of the existing civil service structure. It goes beyond the extension of civil service into new state agencies performing new state functions. It recasts the constitutional policy into a principle of public administraton, one which commands the state to fulfill every new state function through its own agency, eschewing administration through separate entities. So broad a construction of article XXIV has not been considered in any of the prior decisions.

■    " '. . . A constitution is intended to meet and be applied to any conditions and circumstances as they arise in the course of the progress of

the community. The terms and provisions of constitutions are consistently expanded and enlarged by construction to meet the advancing affairs of men. . . .' " (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 635 [268 P.2d 723].) Article XXIV was presented to California voters in 1934 as a means of establishing a merit system of employment which would eliminate the spoils system. (Proposed Amendments to Constitution, Propositions and Proposed Laws, California Secretary of State (1934) p. 12.) It was not presented as an organic blueprint for the structure of agencies within the state's executive branch.

When article XXIV was adopted, the state government was a relatively simple structure. Aside from education and a few subvention programs, state functions were conducted within a relatively self-contained system of agencies.[4] At that very time American governments, federal and state, were on the edge of burgeoning developments. In the ensuing years and decades a multitude of new public services were undertaken. New assumptions of public responsibility were accompanied by significant shifts in systems and methods of public administration. In part, the new programs were accomplished through the multiplication and expansion of public agencies and staff, in part by innovative techniques of indirect administration. These techniques involved interactions between separate systems, both governmental and private. Public entities now combine vertically and horizontally for the fulfillment of shared objectives. Federal and state grant-in-aid programs engage political subdivisions in a host of cooperative services. States join in interstate compacts and counties and cities in intergovernmental contracts. Government-chartered corporations and autonomous authorities assume a hybrid, public-private character.

Traditional distinctions between public and private action are further obliterated by myriad joint undertakings of governmental and private organizations. The expansion of public agencies evokes counter-pressure for enlarging the role of the "private sector." Limited delegations of public power or function to private groups occur with increased frequency.[5] Private activity becomes so intertwined with state policy as to be trans-

---

[4]Note, for example, that the two *State Compensation Insurance Fund* decisions dealt with the pervasiveness of civil service within the fairly well delineated boundaries of that system.

[5]Delegations of power are considered in *Wilke & Holzheiser, Inc.* v. *Department of Alcoholic Beverage Control* (1966) 65 Cal.2d 349 [55 Cal.Rptr. 23, 420 P.2d 735]; *Allied Properties* v. *Department of Alcoholic Beverage Control* (1959) 53 Cal.2d 141 [346 P.2d 737]; Davis, Administrative Law Treatise (1958) § 2.14; Comment, (1954) 67 Harv.L.Rev. 1398. Examples of function or role delegation, usually by contract, appear in: *People* v. *City of Long Beach* (1959) 51 Cal.2d 875 [338 P.2d 177]; *Simpson* v. *City of Los Angeles* (1953) 40 Cal.2d 271 [253 P.2d 464]; *Sacramento Chamber of Commerce* v. *Stephens* (1931) 212 Cal. 607 [299 P. 728]; *Haggerty* v. *City of Oakland* (1958) 161 Cal.App.2d 407 [326 P.2d 957].

muted into governmental action for the purpose of evoking constitutional safeguards.[6] Commercial and nonprofit research organizations, as well as universities, engage in government-sponsored research and development projects. Complex environmental and social problems call for interdisciplinary teams, combining the resources of government, industry, science and education. In many areas government confines its role to that of originator, financier and policy arbiter, leaving direct administration in quasi-private or private hands. Commentators employ the phrase, "government by contract" or "administration by contract," to describe this phenomenon.[7]

Viewed within the conceptual framework of these evolutionary developments, the constitutional policy of a merit employment system within the system of state agencies engenders no demand for achieving expansions of state function exclusively through the traditional modes of direct administration. It does not prohibit legislative experimentation in new forms to fit new functions. It compels expansion of civil service with expansions of state agency structure but does not force expansions of state agency structure to match extensions of state function. To the contrary, the state civil service suffers no displacement and the underlying constitutional policy is not offended when a new state activity is conducted by contract with a separate public or private entity.

Arguably, the letting of service contracts opens the door to the spoils system, thwarting an objective of article XXIV. That assertion opens policy issues transcending the scope of the civil service amendment. At that point the question becomes not how to do it, but who is to dominate it. The civil service provision is only one of a number of devices for minimizing patronage and favoritism. Those practices take many forms other than letting service agreements to favored applicants. The Legislature is the

[6]*Evans* v. *Newton* (1966) 382 U.S. 296, 299-300 [15 L.Ed.2d 373, 377-378, 86 S.Ct. 486]; *Burton* v. *Wilmington Parking Authority* (1961) 365 U.S. 715, 724-725 [6 L.Ed.2d 45, 51-52, 81 S.Ct. 856]; *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 536-537 [50 Cal.Rptr. 881, 413 P.2d 825]; see Miller, *The Constitutional Law of the "Security State"* (1958) 10 Stan.L.Rev. 620.

[7]Nigro, Modern Public Administration (1965) p. 24; Miller, *Administration by Contract: A New Concern for the Administrative Lawyer* (1961) 36 N.Y. U. L. Rev. 957; see also, Miller, *Toward the "Techno-Corporate" State?—An Essay in American Constitutionalism* (1968) 14 Villanova L.Rev. 1; *Private Responsibility for Public Management* (March-April 1967) Harv. Bus. Rev. p. 7.

We describe these phenomena without any attempt at value judgments. The normative problem, of course, is whether the center of power is to reside with the public or the private sector. See Drucker, The Age of Discontinuity (1969) pp. 233-242; Frankel, High on Foggy Bottom: An Outsider's Inside View of the Government (1969) pp. 236-237; Galbraith, The New Industrial State (1967) pp. 310-316; Miller, Private Governments and the Constitution, reprinted in Hacker, The Corporation Take-Over (1964) p. 122.

creative and controlling element. It may, within constitutional limits, authorize the contract and simultaneously prevent abuses.[8]

In this case the 1965 Legislature established a new state program[9] and authorized its conduct "to the extent feasible" by contract with nongovernmental carriers of health care services. (Welf. & Inst. Code, §§ 14000, 14104, fn. 1, *supra*.)  ▉  The complaint alleges no facts showing that partial contractual conduct of this new state program effects a displacement of state civil service. On the face of the complaint, the authorizing statutes and the contract do not violate article XXIV of the State Constitution.

Judgment affirmed.

Regan, J., and Janes, J., concurred.

Petitions for rehearing were denied May 7, 1970, and the following opinion then rendered:

**THE COURT.**—The California State Employees' Association and the Attorney General have filed separate requests for rehearing.

As we observed in our opinion, the decisions of the state Supreme Court have indicated the permissibility of service agreements when the work cannot be "adequately or competently or satisfactorily" performed by civil service personnel. (*Burum* v. *State Comp. Ins. Fund,* 30 Cal.2d 575, 582 [184 P.2d 505]; see also *State Comp. Ins. Fund* v. *Riley,* 9 Cal.2d 126, 135 [69 P.2d 985, 111 A.L.R. 1503].) The Attorney General points out that the Department of General Services, State Personnel Board and State Controller have developed a set of criteria (really an elaboration of the above test) by which to measure the validity of service contracts. He expresses concern, which we believe to be unfounded, that our decision somehow destroys or interferes with these criteria.

Referring to the *Burum* test as the "old rule" and our decision as the "new rule,' the Attorney General states: "The new rule cannot supplant the old rule without disruption. There are still a number of situations where

---

[8]Parenthetically, we note the existence of a statutory public bidding requirement covering Medi-Cal contracts with carriers. (See Welf. & Inst. Code, § 14104, subd. (g).

[9]Earlier, the Legislature had authorized state participation in a federal grant-in-aid program providing medical care to welfare recipients and the medically indigent. That program was administered by the counties. (See Stats. 1957, ch. 1068; ten Broek. *California's New Medical Care Law and Program* (1958) 46 Cal.L.Rev. 558.) The Medi-Cal law of 1965 for the first time placed the state in the business of providing medical care for the needy.

civil service employees cannot, from a factual standpoint, satisfactorily or adequately perform certain work. Yet there is not specific legislation authorizing a contract for such work and it is not a new type of activity. Thus, we would have to have both rules now unless complete disruption is to result. The opinion is unclear as to whether the old rule is still to be applied as well as the new rule. . . ."

Our opinion in this case specifically declared that we were dealing with a situation not involved in either of the *State Comp. Ins. Fund* cases, that is, a new state function not previously conducted by any state agency and performed by contract under legislative direction and authority. The "new rule" is confined to that situation. This court has no authority to supplant the "old rule" formulated in decisions of the State Supreme Court.

The petitions of the appellants and respondent Flourney for a hearing by the Supreme Court were denied June 10, 1970.