Filed 8/5/13  Dept. of Corrections v. State Personnel Board CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DEPARTMENT OF CORRECTIONS AND REHABILITATION,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STATE PERSONNEL BOARD,<br><br>Defendant and Respondent;<br><br>AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES LOCAL 2620, AFL-CIO,<br><br>Real Party in Interest and Appellant. | C068744<br><br>(Super. Ct. No. 34201080000722CUWMGDS) |

This appeal involves the use of private contractors to perform state functions.  The Department of Corrections and Rehabilitation (CDCR) entered into contracts with private contractors to provide mental health services to parolees pursuant to Penal Code

1

section 3073.[1]  On behalf of the CDCR employees it represents, the American Federation of State, County, and Municipal Employees Local 2620, AFL-CIO (AFSCME) sought administrative review by the State Personnel Board (the Board), which concluded the contracts were invalid under civil service laws prohibiting state agencies from contracting with private entities to perform services customarily or historically performed by state employees.  (Cal. Const., art. VII.)[2]  CDCR filed a petition for writ of administrative mandamus.  (Code Civ. Proc., § 1094.5.)  The trial court granted the petition, ruling that the personal services contracts were valid under the "new state function" exception to the civil service mandate in Government Code section 19130, subdivision (b)(2).[3]  AFSCME

---

[1]  Penal Code section 3073 provides:  "[CDCR] is hereby authorized to obtain day treatment, and to contract for *crisis care* services, for parolees with mental health problems.  Day treatment *and crisis care* services should be designed to reduce parolee recidivism and the chances that a parolee will return to prison.  The department shall work with counties to obtain day treatment and crisis care services for parolees with the goal of extending the services upon completion of the offender's period of parole, if needed."  (Italics added.)  (Stats. 2007, ch. 7, § 12 (sometimes referred to herein as AB 900).)

[2]  California Constitution, article VII, section 1 provides:  "(a) The civil service includes every officer and employee of the State except as otherwise provided in this Constitution. [¶]  (b) In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination."  The State Personnel Board is a constitutional agency charged with enforcing the civil service statutes.  (Cal. Const., art. VII, § 3.)

[3]  Undesignated statutory references are to the Government Code.

Section 19130 provides in part:  "The purpose of this article is to establish standards for the use of personal services contracts.  [¶]  (a) Personal services contracting is permissible to achieve cost savings [under specified conditions].  [¶]  (b) Personal services contracting also shall be permissible when any of the following conditions can be met: . . .  [¶]  (2) *The contract is for a new state function and the Legislature has specifically mandated or authorized the performance of the work by independent contractors*.  [¶]  (3) The services contracted are not available within civil service, cannot be performed satisfactorily by civil service employees, or are of such a highly specialized

2

appeals, arguing the trial court erred in reweighing the evidence before the Board, and the evidence supported the Board's determination that the services did not comprise a new state function.

We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1954, CDCR established the Parole Outpatient Clinic (POC) program to reduce recidivism by helping parolees with mental health problems successfully reintegrate into the community. In 1999, CDCR implemented the Mental Health Services Continuum Program (MHSCP), consisting of (1) a Transitional Case Management Program for the Mentally Ill (TCMP-MI), which provides prerelease assessments of inmates identified as part of the prison's mental health services delivery system, and (2) POC, which provides mental health assessments and treatment during parole. Treatment consists of medication management, group therapy, and individual therapy to parolees at high risk of criminal behavior due to mental illness. POC staff conduct evaluations and provide outpatient services and medication management in CDCR parole offices located throughout the state. POC does not provide housing or inpatient care. POC staffing includes clinical social workers and psychologists.

In 2007, the Legislature enacted Penal Code section 3073, (fn. 1, *ante*) directing CDCR to work with counties in providing day treatment programming and mental health *crisis* intervention for parolees with mental health problems. The statute expressly

---

or technical nature that the necessary expert knowledge, experience, and ability are not available through the civil service system. [¶] . . . [¶] (8) The contractor will provide equipment, materials, facilities, or support services that could not feasibly be provided by the state in the location where the services are to be performed." (Italics added.)

 A personal services contract is any contract under which labor or personal services is a significant, separately identifiable element; the party performing these services must be an independent contractor that does not have status as a State employee. (Cal. Code Regs., tit. 2, § 547.59(a).)

authorizes CDCR to contract for those services.[4]  The statute was part of the Public Safety and Offender Rehabilitation Services Act of 2007, which was enacted in response to federal court cases regarding California prison overcrowding.  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of AB 900 (2007-2008 Reg. Sess.) as amended April 26, 2007, pp. 6-8.)  Among the purposes of the legislation was to "require[] CDCR to implement and significantly enhance anti-recidivism programming including substance abuse treatment, mental health care, and academic and vocational education."  (Office of Assem. Floor Analysis, 3d reading analysis of AB 900 (2007-2008 Reg. Sess.) as amended April 26, 2007, p. 1.)

In response to the enactment of Penal Code section 3073, CDCR developed a program called Integrated Services for Mentally Ill Parolees (ISMIP) to fill a gap in services between POC's outpatient role and a 72-hour hold for parolees who were a danger to themselves or others or gravely disabled under Welfare and Institutions Code section 5150 (5150 hold).[5]  ISMIP is a comprehensive model that provides for varied levels of care, supportive/transitional housing resources, and an array of mental health rehabilitative services that assist with the development of independent living for mentally ill parolees in the least restrictive environment possible.

---

[4]  AFSCME's appellate brief expressly states that AFSCME does not dispute that the contracts were "authorized" within the meaning of Government Code section 19130, subdivision (b)(2) (fn. 3, *ante*) by Penal Code section 3073 (fn. 1, *ante*), which authorizes CDCR to contract for crisis care services.

[5]  Welfare and Institutions Code section 5150, subdivision (a) provides:  "When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Health Care Services as a facility for 72-hour treatment and evaluation."

As attested to by ISMIP manager Robert Storms, the resources, facilities and services for the ISMIP program could not be adequately provided by POC, and therefore CDCR tried to contract with counties for these services under Penal Code section 3073. However, CDCR was able to contract with only two county providers -- San Francisco and Santa Clara. Other counties contracted for these services privately. Accordingly, CDCR sought private contractors to meet the benchmark required by Penal Code former section 7021, subdivision (a)(8), that "At least 300 parolees are being served in day treatment or crisis care services, pursuant to Section 3073."

CDCR issued a Request for Proposal (RFP) No. 6000000037.[6] (Gov. Code, § 19132;[7] Cal. Code Regs., tit. 2, § 547.59 et seq.) The project introduction of the RFP references CDCR's authority pursuant to Penal Code section 3073 to contract for "Mental Health *Crisis* intervention . . . services." (Italics added.) The RFP described the responsibilities of ISMIP case managers[8] as including a complete assessment of the parolee's needs and goals, development of a personal services plan, linkage with all appropriate community services, housing referrals, monitoring the quality and follow through of services, providing necessary advocacy to ensure receipt of services, and providing individualized coaching to achieve the parolee's goals. The RFP said each individual personal services plan was to contain objectives, which could include but were not limited to, provision for housing and employment, application for entitlements

---

[6] AFSCME filed a challenge to an earlier RFP, but CDCR withdrew the earlier RFP.

[7] Section 19132 provides: "The . . . Board, at the request of an employee organization that represents state employees, shall review the adequacy of any proposed or executed contract which is of a type enumerated in subdivision (b) of Section 19130. . . ."

[8] "Case manager" is described in the RFP: "Each parolee-client shall have a clearly designated mental health personal services coordinator (Case Manager) who, as a part of a multidisciplinary treatment team, is responsible for providing or assuring needed services."

(Social Security, Medi-Cal, Veterans benefits), coordination and access to mental health services such as medications, psychiatric and psychological services, substance abuse services, family support and consultation services, and access to academic education or skills training.

In 2009, CDCR contracted with private companies to provide the personal services of mental health personal services coordinator to parolees, with the intent of "promot[ing] self-sufficiency in reducing recidivism for mentally ill parolee-clients. This appeal involves six[9] contracts -- four with Telecare Corporation, one with Turning Point of Central California, Inc., and one with Quality Group Homes, Incorporated.

Each Agreement Summary contained the following general statement of purpose or Agreement Outline: "Contract is necessary in order for the [CDCR], Division of Adult Parole Operations, to provide rehabilitation, reduce homelessness, and reduce recidivism among the mentally ill parolee population." Each Agreement Summary stated as Justification for Contracting Out that, under Government Code section 19130, subdivision (b)(3), "The services contracted are not available within civil service. Contract is for the care/placement of mentally ill inmates/parolees requiring job training and life skills. The CDCR currently does not own or operate this type of facility."[10]

---

[9] A seventh contract between CDCR and the San Francisco Department of Public Health is not at issue in this appeal.

[10] As will be seen, the Board rejected the applicability of section 19130, subdivision (b)(3), the nature of the services exception. CDCR does not argue its applicability in this appeal.

In November 2009, AFSCME filed with the Board an administrative challenge to the six private contracts. (Pub. Contract Code, § 10337.)[11] AFSCME sought disapproval of the contracts on the ground they called for private contractors to perform the same work as civil service employees.

CDCR sought dismissal of the challenge, because the contracted services were for ISMIP and were not services provided by CDCR employees.

The Board directed CDCR to provide copies of the contracts, which it did, and invited AFSCME to file a supplemental brief, which it did not.

In March 2010, Board Executive Officer Suzanne M. Ambrose issued a decision (Pub. Contract Code, § 10337, subd. (c); see fn. 11, *ante*), concluding CDCR failed to establish that the contracts were permitted under Government Code section 19130, subdivision (b) (see fn. 3, *ante*). She concluded civil service clinical social workers *could* provide the same services as the contractors and stated she did not need to address psychologists. She said AFSCME asserted the private contractors performed work similar to civil service employees in the same settings and under the same conditions,

---

[11] Public Contract Code section 10337, subdivision (c), provides: "A contract proposed or executed pursuant to subdivision (b) of Section 19130 of the Government Code shall be reviewed by the State Personnel Board if the board receives a request to conduct such a review from an employee organization representing state employees. Any such review shall be restricted to the question as to whether the contract complies with [Government Code section 19130, subdivision (b)]. The board shall delegate the review of such a contract to the executive officer of the board. If the employee organization requests it, the executive officer shall grant the employee organization the opportunity to present its case against the contract and the reasons why the contract should be referred to the board for a hearing. Upon a showing of good cause by the employee organization, the executive officer shall schedule the disputed contract for a hearing before the board for the purpose of receiving evidence and hearing arguments concerning the propriety of the disputed contract. The executive officer shall approve or disapprove the contract or refer it to the board for a hearing within 30 days of its receipt. The reasons for the decision by the executive officer, or the board, approving or disapproving the contract shall be stated in writing."

7

but "AFSCME offered no evidence to show that the work 'settings' and 'conditions' of the employees represented by AFSCME are similar to those of the contractors. Nonetheless, it is necessary to examine" whether the asserted similarity had factual support. She said the purpose of the contracts was to provide individuals in the ISMIP project a safe, clean, drug-free environment to facilitate rehabilitation and reduce homelessness and recidivism among mentally ill parolees. The contracts required the contractors to assess parolees' needs/goals, develop parolee-driven personal service plans (Plans), link parolees with all appropriate community services, make housing referrals, monitor the quality and follow-through of services, provide necessary advocacy to ensure that parolees receive the services in their Plans, and provide individualized coaching. Under the contracts, the Plans had to help parolees find the most independent and least restrictive and immediate, transitional or permanent housing feasible in the local community; help them get jobs or productive activity; secure benefits from Social Security, Medi-Cal, and Veterans Affairs; help parolees self-manage serious mental illness; coordinate access to mental health services such as medications, psychiatric and psychological services; provide parolee-directed services for psychosocial rehabilitation and recovery; provide substance abuse services; help secure parenting and family support and provide consultation, peer group support, or self-help group support; create and maintain a support system of friends and family and facilitate participation in community activities; help parolees access academic education or career-specific trade or skill training; and help in transition upon discharge from parole.

The Board Executive Officer said these services appeared to be within the customary duties of civil service clinical social workers. According to the Board's job specifications, clinical social workers are required to conduct assessments and summarize case information for use in diagnosis, treatment, and dispositional release of disabled inmates; diagnose and/or collaborate in the formulation of a diagnosis; develop, monitor and modify treatment plans in collaboration with the interdisciplinary

8

treatment team; identify and recommend appropriate services based on assessments; provide individual and group therapy as delineated in the treatment plan; provide suicide and crisis risk assessment and intervention; participate in risk assessment, evaluation, and recommendation for alternative level of care placement, release to the community, or other case disposition; coordinate discharge planning activities and act as a resource on accessing appropriate community support and services upon release; respond to requests from clients, family members, courts and community agencies; consult with colleagues; prepare social work reports; and participate in training and research. CDCR has the prerogative to assign clinical social workers specific duties such as assessing disabled parolees' needs, devising detailed and individualized planning, assisting parolees in obtaining appropriate community services, education, housing, eligible benefits, and trade/occupation, coordinating access to health care, facilitating their efforts to achieve or maintain a productive life, and providing general advocacy for disabled parolees. The Executive Officer stated, "It is not difficult to see that these duties are the very tasks required under the Contracts."

The Executive Officer's comparison did not take into consideration work days or work hours. Nevertheless, the Executive Officer concluded CDCR had failed to establish that the contracts were permitted under any exception in section 19130, subdivision (b).

In April 2010, CDCR appealed the Executive Officer's decision to the Board. (Cal. Code Regs., tit. 2, § 547.66.)[12] CDCR submitted a declaration from ISMIP

---

[12] California Code of Regulations, title 2, section 547.66 states: "Any party may appeal the executive officer's decision to the board by filing a written request with the board within 30 days after issuance of the executive officer's decision. (See § 547.64(b).) Upon receipt of a timely appeal, the executive officer shall schedule the matter for briefing and oral arguments before the board. The board will decide the appeal upon the factual information, documentary evidence, and declarations submitted to the executive officer before he or she issued his or her decision. Upon the objection of a party, the board will not accept additional factual information, documentary evidence, or

manager Robert Storms, that "Services provided by the contractors include[] *24/7 crisis care*, including in[]patient services for enrolled parolee-clients; vocational training; housing referrals and linkage; parolee transportation; and administrative support, office space and necessary equipment."[13]  (Italics added.)  He attested the services "cannot be performed satisfactorily by civil service employees within the counties in which these services were contracted."

On August 3, 2010, the Board conducted a hearing at which it heard testimony in the form of oral statements.[14]  AFSCME representative Cliff Tillman stated that services under the contacts were not "new" and were being performed and could be performed by existing CDCR social workers or psychologists.

Sean Carey, a CDCR clinician at the Victorville POC, acknowledged some of the contract services "are the things that we don't do."  He said "day treatment" was regularly performed, but mostly with "enhanced outpatient" clients (EOPs) who require such services the most.  He said, "we would very much like to do more, if given the opportunity, but we are doing this and we are capable of it.  [¶]  As far as monthly and every few weeks, . . . it was alluded to that our services are haphazard.  The only reason why these would be haphazard would be due to scheduling conflict, not that we can't do this.  We would love to do this.  And in many areas, it isn't that we're not doing it.

---

declarations that were not previously filed with the executive officer if the board finds that the submission of this additional factual information, documentary evidence, or declarations would be unduly prejudicial to the objecting party."

[13]  We disregard AFSCME's unsupported disparagement of the declaration as a "lawyer-prepared declaration" of "dubious credibility."

[14]  The Board may accept "additional factual information" at the hearing.  (Cal. Code Regs., tit. 2, § 547.66; see fn. 12, *ante*.)  The hearing transcript, which begins midsentence, does not reflect that anyone was sworn in before speaking to the Board, but no one raises an issue about it, and the Board referred to the oral statements as "testimony."

For the most critical of clients, we do." The only individuals Carey sees on a regular basis, i.e., once or twice a week, are sex offenders. POC can arrange transport via agents or ambulance for suicidal or homicidal parolees. POC can arrange housing for sex offenders. Carey claimed private contractors are not aware of the locations of schools, parks, and "temporary daycares," to ensure that housing for sex offenders is a sufficient distance to comply with Jessica's Law. Carey said "[t]he contract is almost a job description of what we do."

Amy Kim, a CDCR licensed clinical social worker out of POC's in the Los Angeles area and a chair of a POC steward's council, stated, "we've always wanted to be able to do more." She stated CDCR clinicians, psychiatrists, social workers and psychologists were unhappy that AB 900 money was going to private contractors instead of to "existing rehab people to beef up the services we want to do and can do."

Debra Webb, a CDCR psychologist at a Los Angeles POC, stated that POC clinicians travel to clients' homes and "[w]e'd like to be able to do more of that." She said CDCR provides housing and has contracts for some of the EOP's. She sees some of her clients more than once a week. Clients who have crisis issues "know how to call crisis lines," and they can call their parole agent, go to a hospital, call a hospital, or call 911. She agreed mentally ill clients need additional services.

A Board member asked, "What specifically can private contractors provide that our state civil service professionals cannot? Bottom line, what is it?" Storms responded "24-hour access, seven days a week, 365 days a year inpatient care, structured mental health board and care, facilitated care. Things that we do not have; they do not exist."

Dr. Webb said, ". . . Actually, that's not really what's happening; they aren't really providing those services out there. What they do is the same kinds of things [*sic*] that we do, is hookups with board and care, help them get access to hospitals on a 5150 basis when they need to. And, by the way, you have to be a peace officer to do that, so our agents help with that. We do give them resources for the 24-hour care."

11

Dr. Webb said the private contractors "are providing lists of community services for individuals who . . . need medical treatment. We do the same thing: We give them lists of services; we will make phone calls for them for clients that aren't able to do that; we help them find the housing; we help them find the SOR housing in downtown L.A.; we do applications for disabled bus passes. . . . [¶] We help them with a whole array of wraparound services. It does not appear that the outside provider is really doing anything that we don't." Dr. Webb did not say POC provides any of these services on a 24/7 basis.

Carey stated: ". . . Nowhere in the contract does it say that these individuals have to maintain a -- a 24-hour inpatient service. And what they do is they're going to refer to county. And that's the same thing that we do. And it is 24 hours, because they have 24-hour access to the parole agent who, if they are suicidal or homicidal -- which the contracts can deal with -- if they are suicidal or homicidal, they will take them into county, no different than we would."

Storms said, "The contract does require that they have 24-hour response to the -- they provide a hotline; each contractor has to provide 24-hour, seven-day[]-a-week access. [¶] Peace officers do not certify 5150's. It's mental health staff that certifies 5150's, and our staff cannot. Peace officers present individuals for 5150's. Our peace officers are not necessarily available 24 hours a day."

On September 7, 2010, the Board issued a resolution adopting the Executive Officer's decision and disapproving the contracts. The Board found:

1. CDCR failed to demonstrate the services are a "new state function" under section 19130, subdivision (b)(2), because it did not prove, in addition to legislative authorization, that the service truly comprised a new governmental activity and not merely expansion of an existing function. The Board cited its decision in a previous

12

matter -- *In the Matter of the Appeal by California Department of Forestry and Fire Protection* (2001) PSC No. 01-04 (*CDF*).[15]

2.      CDCR failed to demonstrate that the contracted services cannot be performed satisfactorily by civil service employees under section 19130, subdivision (b)(3), the "nature of the services" exception, because AFSCME adequately showed that state employees in their current positions perform the same services that are provided under the contracts.

3.      CDCR failed to demonstrate that the contracted services are justified under section 19130, subdivision (b)(8), because CDCR did not provide credible evidence to show what specific "equipment, materials, facilities, or support services" the contractor will provide at specific locations that could not feasibly be provided by the state.

Since the contracts had already been executed, the Board gave CDCR six months to transition from private contractors to civil service employees.

On November 29, 2010, CDCR filed the operative pleading -- a first amended petition for writ of administrative mandate and first amended complaint for declaratory relief, naming the Board and AFSCME as defendants and AFSCME as real party in interest. The pleading alleged the Board failed to perform an act required by law and

_____

[15] The parties appear to believe *CDF* was a precedential Board decision under section 19582.5, which states the Board "may designate certain of its decisions as precedents. . . . All decisions designated as precedents shall be published in a manner determined by the Board." However, *CDF* is not a published precedential decision; rather, it is a posted personal services contract decision which, according to the Board website, is "not designated precedential but [is] posted here for informational purposes only"; it is "not binding on the Board in future cases but may be cited by parties for their persuasive value." (See http://spb.ca.gov/board/contract_decisions.cfm. [as of August 5, 2013].) In any event, even Board precedential decisions are not binding on this court. (*California Dept. of Corrections v. State Personnel Bd*. (2004) 121 Cal.App.4th 1601, 1618.)

made findings unsupported by the evidence. The hearing on the petition and complaint took place on April 8, 2011.

On May 25, 2011, the trial court entered judgment in favor of CDCR. The judgment incorporated the court's ruling under submission. The trial court said the Executive Officer improperly focused on the "nature of the services" test of section 19130, subdivision (b)(3) -- i.e., "whether the tasks and skills required by the contracts can be adequately, competently, and satisfactorily performed by civil service employees" -- and ignored the "new state function" test of section 19130, subdivision (b)(2). The court noted that the "Executive Officer did not make any factual findings relating to the 'new state function' test, i.e., whether the contracted services displace existing state civil service functions or, instead, embrace new functions not previously undertaken by the state or covered by an existing agency." The court also noted that the Board concluded CDCR failed to prove new state function, but that the Board made no express factual findings to support this conclusion. The court said the Board's decision necessarily *implied* a finding that the contracted services duplicate or displace existing civil service functions, but no substantial evidence supported this implied finding. To the contrary, undisputed evidence showed the contracted services represented a new government program intended to "fill a gap" in service for mentally ill parolees between POC and 5150 holds. The court said the Board and AFSCME took "too literal an approach" in maintaining that the contracted services were an expansion of an existing state function. POC workers can and do provide mental health services, but "they do not provide 24/7 crisis care in an in[]patient setting," and "[t]his is the novelty of the contracted services which renders them a new state function." The court concluded CDCR had the right to enter into the contracts because the contracted services were a "new state function" under section 19130, subdivision (b)(2), and the Board abused its discretion in concluding otherwise. The trial court directed issuance of a peremptory writ of mandate

14

commanding the Board to set aside its decision and issue a new decision concluding the contracts were valid.

## DISCUSSION

## I. Standard of Review

On appeal, we review the Board's decision, applying the same standard as the trial court. We ask whether the Board's findings are supported by substantial evidence. (*Pan v. State Personnel Bd.* (1986) 180 Cal.App.3d 351, 357.) We uphold the Board's factual determinations if they are supported by substantial evidence in light of the whole record (Code Civ. Proc., § 1094.5, subd. (c)), and all reasonable and legitimate inferences must be drawn in support of those findings (*Pan*, *supra*, at p. 357).

"Substantial evidence" is relevant evidence that is reasonable, credible, and of solid value that a reasonable mind might accept as adequate to support a conclusion. (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584-585 (*California Youth Authority*).) Different from the substantial evidence test in other contexts, the substantial evidence standard in State Personnel Board cases requires that reviewing courts consider *all* evidence, including that which fairly detracts from the evidence supporting the Board's decision. (*Id*. at p. 586.) However, we do not reweigh the evidence and must indulge all presumptions and resolve all conflicts in favor of the Board's decision. (*Camarena v. State Personnel Bd.* (1997) 54 Cal.App.4th 698, 701 (*Camarena*).)

The Board's legal conclusions, however, are reviewed de novo. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7.) We give deference to an agency's interpretation of statutes affecting issues within its administrative sphere. (*Camarena*, *supra*, 54 Cal.App.4th at p. 701.) But "an agency's interpretation of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp.*, *supra*, 19 Cal.4th at p. 7, italics omitted.)

15

" 'The ultimate interpretation of a statute is an exercise of the judicial power . . . conferred upon the courts by the Constitution and, in the absence of a constitutional provision, cannot be exercised by any other body.' " (*Ibid*.) Thus, it is our duty to construe statutes. (*Ibid*.)

## II. "New State Function" Test

AFSCME argues the trial court's judgment must be reversed because the trial court applied an improper legal standard for the "new state function" test which would invalidate a private contract only if it literally displaced civil service employees by firing them or laying them off. We disagree with AFSCME's contention that the trial court misapplied the law.

The purposes of the constitutional civil service provision (fn. 2, *ante*) are " '(1) to encourage efficiency and economy in state government, and (2) to eliminate the "spoils system" of political patronage by ensuring that demonstrated fitness--rather than political considerations--spurs all appointments to public service.' " (*California Correctional Peace Officers Assn. v. Schwarzenegger* (2008) 163 Cal.App.4th 802, 821; see *id.* at pp. 820-821 [private contracts with out-of-state private prisons to house California inmates during declared emergency of prison overcrowding did not violate civil service mandate].) Courts have interpreted the civil service mandate as forbidding private contracting for services that are of a kind that persons selected through civil service could perform adequately and competently. (*California Correctional Peace Officers Assn.*, *supra*, at p. 821.) Exceptions to this rule are set forth in section 19130. (*Ibid*.)

Here, as the trial court observed, the Board's reliance on its prior decision, *CDF*, was misplaced, because that decision confused the "nature of the services" test of section 19130, subdivision (b)(3), with the "new state function" test of subdivision (b)(2) (fn. 3, *ante*).

Under the "nature of the services" test, the question is whether the services at issue *could* be performed by civil service employees, regardless of whether they in fact are

16

being so performed. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1033 (*Kempton*); *Professional Engineers v. Department of Transportation* (*California Transportation Ventures*) (1993) 13 Cal.App.4th 585, 593 (*California Transportation Ventures*); *State Compensation Ins. Fund v. Riley* (1937) 9 Cal.2d 126, 135.) If the services could be performed by civil service employees, contracts to private contractors cannot be justified under the "nature of the services" test. (*Ibid*.)

In contrast, the "new state function" test allows private contracts " 'if the state seeks to contract for private assistance to perform *new functions* not previously undertaken by the state or covered by an existing department or agency.' " (*Kempton*, *supra*, 40 Cal.4th at p. 1033, original italics; *California State Employees' Assn. v. Williams* (1970) 7 Cal.App.3d 390, 397-400 [permitting state to hire private insurance carriers to administer state Medi-Cal program].) " '[I]f the services . . . *do not duplicate functions of an existing agency*, the contract is permissible.' " (*Professional Engineers v. Dept. of Transportation* (1997) 15 Cal.4th 543, 549 (*Dept. of Transportation*), original italics.) As our high court has noted, the "nature of the services" test is inapplicable if the state seeks to contract for the performance of new functions not previously undertaken by the state. (*Id.* at p. 549, citing *Williams*, *supra*, 7 Cal.App.3d at pp. 397-400; *Kennedy v. Ross* (1946) 28 Cal.2d 569, 571-574; *San Francisco v. Boyd* (1941) 17 Cal.2d 606, 618-620.)

The "new state function" test calls for a function not performed by any existing agency of state government. Under this test, courts ask whether contracted services "displace existing state civil service functions or, instead, embrace a new state activity or function." (*California Transportation Ventures*, *supra*, 13 Cal.App.4th at p. 593.) "The key in such cases is whether a contract displaces the civil service." (*Savient Pharmaceuticals, Inc. v.Department of Health Services* (2007) 146 Cal.App.4th 1457, 1467, italics omitted.) The reason for this inquiry is that "the civil service mandate is

aimed at protecting 'the existing civil service structure,' and does not compel the state 'to fulfill every new state function through its own agency.' " (*Dept. of Transportation*, *supra*, 15 Cal.4th at p. 549.)  Section 19130, subdivision (a) is "carefully crafted to permit personal service contracts to achieve cost savings only when they will have no detrimental effect on the integrity of the civil service system." (*California State Employees' Assn. v. State of California* (1988) 199 Cal.App.3d 840, 846; see *id.* at p. 844 [rejected facial challenge to constitutionality of section 19130, subd. (a)].)  "The statute combines considerations of efficiency and economy with other interests, including those of state employees." (*California State Employees' Assn. v. State of California*, *supra*, at p. 846.)  In *Department of Transportation v. Chavez* (1992) 7 Cal.App.4th 407 (*Chavez*), this court held that where personal service contracts for maintenance of highway rest stops were executed 20 years after the authorizing statute was enacted, and a designated state agency used state employees for most of that work during those intervening years, the Board could properly decide that the work eventually contracted out did not relate to or stem from a new state function within the meaning of section 19130.  (*Chavez*, *supra*, at pp. 409-411, 416.)

Thus, whether services are a "new state function" depends not on whether, in theory or in fact, they *could* be performed by civil service employees, but rather whether they *are*, at the time of the contracts, already being performed by civil service employees.

Moreover, the "new state function" test should not be interpreted too narrowly.  In *California Transportation Ventures*, the court addressed whether contracting out construction of state toll roads was permissible as a "new state function." (*California Transportation Ventures*, *supra*, 13 Cal.App.4th at pp. 592-593.)  The program gave private developers exclusive leases during which the developers would operate the facilities and apply collected tolls to payment of their capital outlay, costs, and a reasonable rate of return on investment.  After the lease term, the facility would revert to the state.  (*Id*. at p. 590.)  Although the court agreed with the state employees that the

18

"design and construction of roads" was not a new state function as a general matter, the court cautioned that the state employees took "too literal an approach" in asserting the demonstration projects were not a new state function. (*Id*. at p. 593.) The court concluded the "novelty" of the projects lay in the privatization of not only their financing (no state funds would be used to defray construction costs), but also their design, construction, and operation. (*Ibid*.) The bar on private contracting of state work should not be interpreted so as to "discourage [such] experimentation," because "[t]he constitutional policy of a merit employment system 'does not prohibit legislative experimentation in new forms to fit new functions." (*Ibid*.)

In contrast, a " ' "new technique' ' " for performing an existing state function does not constitute a " ' "new state function." ' " (*Dept. of Transportation*, *supra*, 15 Cal.4th at p. 571.) In *Dept. of Transportation*, the Supreme Court held that legislation authorizing Caltrans to use private contractors on state highway projects to ensure timely retrofitting for seismic safety and ensure timely project delivery did not involve a "new state function." (*Id*. at pp. 552, 569, 571.) Caltrans had always been responsible for project development of state highway projects; the new legislation did not change that but simply expanded Caltrans's power to contract with private entities to perform that work. (*Id*. at p. 571.) The Supreme Court rejected Caltrans's argument that an " ' "enriched" ' " blend of private contracting to meet responsibilities historically discharged by Caltrans employees created a " ' "new state function." ' " (*Ibid*.) In discussing the decisional law, the Supreme Court said of *California Transportation Ventures* that the legislation there authorized Caltrans to contract with private development firms to construct and operate tollways under state lease, on an experimental basis, to secure needed transportation unobtainable through public financing arrangements. (*Dept. of Transportation*, *supra*, 15 Cal.4th at p. 550.) Although the design and construction of roads were neither new functions nor ones that state workers could not satisfactorily perform, the privatization program in the *California Transportation Ventures* case was an experimental one, and no

19

state funds would be used to defray construction costs, and under these circumstances, considerations of efficiency and economy permitted an exception to the private contracting restriction.  (*Dept. of Transportation*, *supra*, 15 Cal.4th at p. 550.)

In *CDF*, the prior Board decision relied upon by the Board in this case, the Board disallowed contracts CDF entered into with private medical providers to perform initial and periodic medical examinations of firefighters who sometimes must wear respirators while working.  (*CDF*, *supra*, PSC No. 01-04 at p. 1.)  CDF argued the medical examinations were a new state function because they were being conducted in accordance with new regulations promulgated by California's Division of Occupational Safety and Health (Cal-OHSA); CDF had not previously performed medical evaluations on all its respirator users; CDF nurse practitioners had never performed this type of medical evaluation for respirator users; before the regulations, CDF employees could be employed for years without medical evaluation; and the nature and frequency of the newly mandated medical evaluations constituted a significant change in philosophy and practice compared to CDF's past procedures.  (*CDF*, *supra*, at pp. 4-5.)  The Board's entire analysis of "new state function" stated:  "The documents submitted by both CDF and CSEA [employees' association] indicate, however, that CDF has historically performed medical evaluations of employees when they are first appointed as limited term fire apparatus engineers, when they turn 40, and when they turn 55.  In addition, the duties listed in the class specification for Nurse Practitioners call for them to conduct physical examinations.  Thus, from the information CDF has provided, it appears that, under the new Cal-OSHA regulations, CDF was not required to perform a new state function, but, instead, was compelled to expand upon an existing state function.  The expansion of an already existing state function does not constitute a new state function under the first condition of . . . § 19130(b)(2)."  (*CDF*, *supra*, at p. 5.)  The Board cited *Dept. of Transportation*, *supra*, 15 Cal.4th at page 571.  (*CDF*, *supra*, at p. 5, fn. 5.)

20

In *CDF*, the Board's analysis of the "new state function" test was vague, and a fair reading suggests the Board made its determination because the nurse practitioners were *capable* of performing the so-called "expanded" services, not that they were actually performing those functions. We agree with the trial court that the *CDF* analysis, at heart, applied the "nature of the services" test rather than the "new state function" test. Therefore, *CDF* does not support the Board's decision in this case.

AFSCME argues the trial court, in attempting to distinguish *CDF*, stated two inconsistent principles: (1) that a contract may embrace a new state function even if the tasks are or can be performed by existing civil service employees, and (2) that expansion of an existing state function is not a new state function. AFSCME argues the "gap" in services identified by the court is merely an expansion of existing services outside of normal business hours, and merely adding services after business hours does not constitute a "new state function." AFSCME argues that focusing only on a chronological gap in services for the "new state function" test, without regard to the "nature of the services" provided by civil service employees, precludes the possibility that the gap can -- and must, under the civil service mandate -- be an expansion of the agency's existing functions. Presumably, AFSCME would have the State hire more civil service employees, or pay overtime to existing civil service employees, to staff an after-hours POC.

However, no supporting authority is cited. AFSCME cites *Dept. of Transportation.* As indicated, *ante*, the Supreme Court there held that using private contractors on state highway projects to ensure timely retrofitting for seismic safety and ensure timely project delivery did not involve a "new state function," because Caltrans had always been responsible for project development of state highway projects, and the new legislation did not change that but simply expanded Caltrans's power to contract with private entities to perform that work. (*Id*. at pp. 552, 569, 571.) However, the work in that case was work already being done by civil service employees, and no facts

21

supported a finding that civil service staff would be unable adequately and completely to perform the work. (*Ibid.*) Here, in contrast, the evidence showed POC staff do not and would not perform any work after business hours.

AFSCME suggests affirmance of the trial court's judgment would constitute a ruling that "displacement" of civil service for purposes of the "new state function" test occurs only where state workers are actually fired or laid off. We disagree. Indeed, this court concluded the "new state function" test did not apply in *Chavez*, where the existing employees who had maintained the highway rest stops had not been laid off, but had been reassigned to other work. (*Chavez*, *supra*, 7 Cal.App.4th at pp. 410-411, 416.)

Here, as in *Williams*, "the state civil service suffers no displacement and the underlying constitutional policy is not offended when a new state activity is conducted by contract with a separate public or private entity." (*Williams*, *supra*, 7 Cal.App.3d at p. 399.) We reject AFSCME's contention that the trial court applied an improper legal standard for "new state function."

### III. Substantial Evidence

AFSCME argues substantial evidence supports the Board's finding that the contracted services did not comprise a new state function, and the trial court improperly reweighed the evidence before the Board. We disagree.

As indicated, the substantial evidence standard in State Personnel Board cases requires that *all* evidence be considered, including that which fairly detracts from the evidence supporting the Board's decision. (*California Youth Authority*, *supra*, 104 Cal.App.4th at pp. 584-586.) AFSCME's reliance on cases that employ a substantial evidence test in other contexts is misplaced.

The evidence showed that the private contractors provide services that fill a "gap" in services performed by civil service employees in the counties covered by the private

contracts. They provide 24/7 *crisis*[16] care, including inpatient services; vocational training; housing referrals; parolee transportation; and administrative support, office space, and necessary equipment. Without the contracted services, there is a gap in service between POC outpatient services and a 5150 hold. Before the contracts, the counties had to look to local community agencies to try to put together -- piecemeal -- inpatient counseling, transitional services, critical care beds, and overnight crisis counseling/care -- services not provided by POC. Some of the services under the contracts which fill the gap between POC and a 5150 hold are transitional housing, acute case management, and daily meetings with a counselor if necessary. POC workers are tied to the business hours of the parole units, Monday through Friday, excluding nights, weekends and holidays. POC workers do not provide a 24-hour call center or 24/7 access to a mental health professional, housing or the other listed services, as do the private contractors. POC has no specific funding for housing; parole agents merely have "cash assistance" available to assist with transitional housing.

We have considered all the evidence, including the evidence indicating an overlap of services during POC's regular business hours. However, even indulging presumptions in favor of the Board's decision, there is no substantial evidence that civil services employees perform the services that constitute the identified "gap."

AFSCME argues there is such evidence, in that parolees have 24-hour access to their parole agent and parolees know how to call other crisis hotlines or go to a hospital.

---

[16] It is hard to imagine that the Legislature had anything other than 24/7 care in mind when it used the word "crisis" in Penal Code section 3073, given the plain meaning of the word "crisis," which includes "an emotionally significant event or radical change of status in a person's life," "an unstable or crucial time or state of affairs in which a decisive change is impending; *esp* : one with the distinct possibility of a highly undesirable outcome," and "a situation that has reached a critical phase." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 296, col. 2.) The occurrence of such events is not limited to the regular workweek during business hours.

23

AFSCME argues Telecare's 24/7 crisis care is, according to its proposal, just an on-call staff person with a cell phone, to ensure evening and weekend coverage. However, even that is something not done by POC staff. Although AFSCME questions whether the person who carries the phone has adequate training, Telecare also promised to have an administrator and program psychiatrist available for after-hours consultation on an as-needed basis. AFSCME argues "the only feature arguably distinguishing" the private contractors' activities from POC's is that the private contractors "have assumed the role of an after-hours crisis hotline (for parolees who already have 24-hour access to a parole agent and other crisis hotlines)." Thus, AFSCME acknowledges that the private contractors provide something not provided by POC social workers or psychologists.

AFSCME argues there is no evidence of what "in[]patient" care is being provided by the private contractors. AFSCME says it "does not dispute that Telecare or other private contractors may be capable of providing in[]patient services to parolees," but this does not establish that their inpatient services, whether provided directly or by subcontract, is distinct from POC's activities. AFSCME argues the private contractors may merely be subcontracting for inpatient services in a manner already performed by POC staff. AFSCME points to the oral statements of POC staff at the Board hearing, that the private contractors were doing the same kinds of things POC staff did, "hookups with board and care," etc. However, at most, this merely indicates a potential overlap during POC business hours. It says nothing about the gap filled by the private contractors for services not performed by POC staff.

AFSCME says the POC and private contractors work with the same population of parolees. However, the cited evidence is an oral statement by POC psychologist Debra Webb at the Board hearing. She said some parolees were unhappy with one of the private contractors and wanted to come back to POC. However, the Board chair agreed

with CDCR counsel that quality of care by the private contractor was not at issue in the administrative appeal.**17**  We agree as well.

We conclude the evidence is insufficient to support the Board's decision.

### IV.  Remand

AFSCME argues that, if the trial court was correct that the Board failed to apply the correct legal standard and make findings for the "new state function" test, then we should remand to the Board to correct those defects.  We disagree.

Code of Civil Procedure section 1094.5 implicitly requires that administrative agencies set forth findings "to bridge the analytic gap between the raw evidence and ultimate decision or order."  (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515.)  When an administrative agency's findings are not adequate in that regard, remand is an appropriate remedy so that the agency may make the proper findings.  (*Glendale Memorial Hospital & Health Center v. State Dept. of Mental Health* (2001) 91 Cal.App.4th 129, 140.)

However, administrative agency findings need not be stated with the formality and precision required in judicial proceedings, and remand is not appropriate if the court determines that necessary findings reasonably may be implied.  (*North Gualala Water Co. v. State Water Resources Control Bd*. (2006) 139 Cal.App.4th 1577, 1603.)

Here, we conclude (as did the trial court) that remand is not required, because the Board's ultimate decision -- that CDCR failed to prove a "new state function" -- necessarily implied the underlying finding that the contracted services duplicate and displace existing state functions.

---

**17**  The administrative appeal is restricted to the question whether the contract complies with section 19130.  (Pub. Contract Code, § 10337; Cal. Code Regs., tit. 2, § 547.66.)

25

## DISPOSITION

The judgment is affirmed.  CDCR shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                                            MURRAY            , J.


We concur:


          BLEASE          , Acting P. J.


          NICHOLSON        , J.