Filed 7/6/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MANOHAR RAJU et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>    Defendants and Respondents. | A164736<br><br>(Contra Costa County<br>Super. Ct. No. MSRA21-0005)<br><br>**ORDER SUBSTITUTING NOMINAL DEFENDANT, MODIFYING OPINION, AND DENYING REHEARING**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

The "Joint Motion To Substitute Nominal Defendant and Respondent" is granted.

Former Interim Chief Executive Officer Mark Culkins is hereby substituted out and current Chief Executive Officer Brandon Riley is substituted in as nominal party defendant.

It is ordered that the published opinion filed on June 8, 2023, be modified as follows:

1. On page 1, first sentence of the first full paragraph, beginning on line 4, change "Mark Culkins" to "Brandon Riley" so the sentence reads as follows:

Manohar Raju, Donna Doyle, John Dunbar, and Rose Marie Sims appeal a judgment dismissing their taxpayer action against the Superior Court of the

1

City and County of San Francisco (defendant court), Anne-Christine Massullo, and Brandon Riley, the latter in their official capacities as defendant court's presiding judge and chief executive officer (CEO).

2. On page 1, line 4 of footnote 1, insert the words "CEO Riley" in place of "Interim CEO Culkins" so the footnote reads as follows:

Plaintiffs initially named as defendants then Presiding Judge Samuel K. Feng and then CEO T. Michael Yuen in their official capacities. While this appeal was pending, this court granted motions to substitute current Presiding Judge Massullo and current CEO Riley, in their official capacities, as nominal defendants. (See Cal. Rules of Court, rule 8.36.)

3. On page 4, third full paragraph, second sentence beginning with "The total backlog," replace "rose to" with "stood at" so the sentence reads as follows:

The total backlog stood at 388.

4. In footnote 8 on page 9, modify the concluding parenthetical by changing "29" to "28" so that it reads "(See fn. 28, *post*.)."

5. In the middle of the second full paragraph on page 11, in the fourth sentence, beginning with "And contrary to defendant's assertions," insert "improperly" between "to" and "upset" so the sentence reads as follows:

And contrary to defendants' assertions, the sought-after relief does not threaten to improperly upset individual, fact-specific, discretionary decisions on speedy trial motions (to continue a trial beyond its statutory "last day" or to dismiss a case for failure show good cause for such continuance) in individual criminal cases, or to alter the well-established procedural and substantive rules governing such motions.

6. On page 9, in the second-to-last sentence of the paragraph carrying over from page 8, beginning with "Defendants also assert," modify the parenthetical by changing "35" to "34" so that it reads "(see p. 34, *post*)."

7. In the last paragraph at the bottom of page 13, beginning with "Defendants also argue," modify the second sentence by adding the words "discussed above" after "well-established rule," so the sentence reads as follows:

Defendants also argue that there is no authority specifically providing for the assertion of statutory taxpayer claims against a court or judge. However, they have not pointed to any policy of Code of Civil Procedure section 526a, or precedent construing it, that would warrant a judicially created exception to the well-established rule discussed above, simply because the case involves allegations of unlawful activity by a court or judicial officer.

8.  On page 21, in the final sentence of the first full paragraph, beginning with "As discussed below," modify the parenthetical by changing "32–35" to "33–34" so that it reads "(see pp. 33–34, *post*)."

9.  On page 22, the subheading titled "Recent Decisions Assessing" should be replaced with "Recent Authority Assessing" so the subheading will read as follows:

3. Recent Authority Assessing Case-Specific Section 1382 Rulings in Light of *Engram*

10.  In the first full paragraph on page 22, the first sentence begins with "Defendants cite two recent decisions," which should be replaced with "Defendants cite a recent decision" so the sentence reads as follows:

Defendants cite a recent decision denying mandamus petitions filed by criminal defendants seeking dismissal of their individual cases under section 1382.

11.  The first full paragraph on page 24 commencing with "Recently, Division One" and ending with "(*Id*. at pp. 1117, 1118, 1121, 1124.)" should be deleted along with footnote 22, which will require renumbering of all subsequent footnotes.

12.  The first full paragraph on page 25, beginning with "Defendants do not contend that *Hernandez-Valenzuela*" and ending with "at best, as background," should be modified to read as follows:

Defendants do not contend that *Hernandez-Valenzuela* has preclusive effect or establishes some legal principle that would bar plaintiffs' claims as a matter of law. Nor do they explain or cite any authority to support the suggestion (improperly included only in their request for judicial notice) that we could take judicial notice of the truth of any factual findings in that case in a way that would somehow render plaintiffs' claims insufficiently pleaded.

13.   On page 37, in the final sentence of the first full paragraph, beginning with "Here, plaintiffs seek," modify the parenthetical by changing "39–40" to "38–39" so that it reads "(see pp. 38–39, *post*)."

14.   On page 40, delete footnote 31.

There is no change in the judgment.

The petition for rehearing is denied.

Date_____                    _____Acting P. J.

| | |
|---|---|
| Trial Court: | Superior Court of California, County of Contra Costa |
| Trial Judge: | Hon. Edward G. Weil |
| Counsel: | Olivier & Schreiber, Monique Olivier, Christian Schreiber; Miller Shah, James E. Miller and Casey T. Yamasaki for Plaintiffs and Appellants. |
| | Clyde & Co, Alison K. Beanum, Douglas J. Collodel and Kevin R. Sutherland for Defendants and Respondents. |

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MANOHAR RAJU et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>      Defendants and Respondents. | A164736<br><br>(Contra Costa County<br>Super. Ct. No. MSRA21-0005) |

Manohar Raju, Donna Doyle, John Dunbar, and Rose Marie Sims appeal a judgment dismissing their taxpayer action against the Superior Court of the City and County of San Francisco (defendant court), Anne-Christine Massullo, and Mark Culkins, the latter in their official capacities as defendant court's presiding judge and interim chief executive officer (CEO).[1] At issue in this appeal is plaintiffs' taxpayer-standing cause of action for declaratory and injunctive relief to remedy alleged violations of Penal Code provisions that impose a duty on the courts (and others) to expedite criminal proceedings, including by prioritizing them over civil cases, and to follow

---

[1] Plaintiffs initially named as defendants then Presiding Judge Samuel K. Feng and then CEO T. Michael Yuen in their official capacities. While this appeal was pending, this court granted a motion to substitute current Presiding Judge Massullo and current Interim CEO Culkins, in their official capacities, as nominal defendants. (See Cal. Rules of Court, rule 8.36.)

specific procedural steps before a criminal trial may be continued beyond statutory time limits.[2]

The trial court sustained the demurrer pursuant to *Ford v. Superior Court* (1986) 188 Cal.App.3d 737 (*Ford*), which held that one department of a superior court may not restrain the implementation of a judgment entered by another department in a prior action. As we explain, *Ford* is not relevant to the taxpayer cause of action. Nor do defendants' alternative legal challenges permit us to affirm the judgment. Accordingly, we reverse.

### Factual and Procedural History[3]

The complaint, filed in September 2021, alleged that "San Francisco's criminal legal system is in a state of crisis," as over 400 criminal defendants had cases pending past their statutory deadline for trial. Of the defendants, 178 were in jail, typically locked in cells for 23 hours a day; most had been there for months and some, for over a year.

Pre-pandemic, defendant court held most criminal jury trials in 12 departments in its Hall of Justice. The 37 departments in its Civic Center courthouse (Civic Center) were devoted almost wholly to noncriminal cases. In March 2020, COVID-19 shelter-in-place orders led defendant court to shut down and continue all jury trials by 90 days.

When trials resumed in June 2020, at least 11 courtrooms in the Hall of Justice were large enough for socially distanced jury trials, and defendant

---

[2] Although Raju is not listed as a plaintiff only on the taxpayer-standing cause of action, he asserts that he would have standing to join the taxpayer action and will seek leave to do so on remand. As the other appellants plainly have standing to appeal, we need not address the issue.

[3] As the judgment of dismissal followed an order sustaining a demurrer without leave to amend, we accept as true all facts properly alleged in the complaint. (*Minton v. Dignity Health* (2019) 39 Cal.App.5th 1155, 1161.)

2

court had the technical capacity to stream video of its trials on the internet. However, it reopened only four courtrooms for felony trials, and used four more as "satellites," staffed by bailiffs, to which it broadcast live video of trials underway in other courtrooms. The satellite courtrooms often sat empty. Shortages of staff, not COVID safety measures, prevented the reopening of more courtrooms for criminal trials.

By July 2020, 135 criminal cases were pending past their original statutory trial deadline; for 31 of those cases, the defendants were in custody (in-custody cases).

In January 2021, the Judicial Council allocated funds to courts around the state, including defendant court, to address pandemic-driven backlogs. Defendants did not use the funds to open more courtrooms for criminal trials. Around this time, then Presiding Judge Samuel K. Feng addressed the civil bar at a webinar, admonishing that litigants had "better get ready" for their (jury and bench) trials because all of defendant court's civil courtrooms were "available" and "equipped" and the court was "ready to go." At that time, defendant court had assigned 12 courtrooms to conduct civil trials and only four to criminal trials.[4] The next month, the backlog had increased to 183 felony cases beyond their statutory deadlines, of which 68 were in-custody cases.

In April 2021, defendant court began sending "nonviolent misdemeanor" cases (a term not defined by California law) to be tried at Civic Center. It did not send felony, in-custody, or "violent misdemeanor" cases to Civic Center, claiming the courthouse lacked sufficient security.

---

[4] Defendant court continued to designate an additional four courtrooms as "satellites" for remote viewing of criminal trials.

In June 2021, public health officials removed all social-distancing requirements. On June 28, 2021, defendant court opened nine departments in the Hall of Justice, or 14 percent of its 65 total departments, for criminal trials—three for in-custody felony trials, four for out-of-custody felony trials, and two for misdemeanors. It continued to send a few "nonviolent misdemeanor" trials to Civic Center.

By June 29, 2021, the backlog had ballooned to 416 cases, roughly 125 in custody. As of July 2022, only 5 of defendant court's 65 departments (or roughly seven percent) actually were conducting criminal trials. At no time in July or August 2021 were more than seven of its 65 departments (or 11 percent) actually engaged in hearing criminal trials.

Between June 29 and August 30, 2021, defendant court sent out two in-custody cases for trial, while the backlog of in-custody cases grew by 31, to 156 cases. The total backlog rose to 388. Numerous courtrooms were empty and unused, with their doors locked and no indication that any proceedings were being held.

Plaintiffs acknowledge the pandemic's role in precipitating the backlog, but allege that defendants unnecessarily exacerbated the backlog and prolonged its effects by failing to, inter alia: utilize available courtrooms (both civil and criminal), seek out additional resources to help mitigate the backlog, prioritize criminal trials, or take meaningful steps to address security issues that purportedly prevented them from assigning criminal trials to Civic Center courtrooms. Plaintiffs claim defendants improperly failed to utilize Civic Center courtrooms to try any felony, in-custody, or "violent misdemeanor" cases, due to purported security concerns, despite Civic Center's multiple holding cells, airport-style entrance security, and regular staffing by over 20 sheriff's deputies. Moreover, before the pandemic, between 2006–2017,

4

defendant court had safely tried without issue 56 felony cases (24 in-custody) at Civic Center; and from 2018 through March 2020, it tried 166 misdemeanor cases there, including 50 "violent misdemeanors." And in 2021, a 15-day trial in a juvenile murder case deemed "too risky" for the juvenile justice center was tried at Civic Center.

Defendants also exacerbated the backlog by failing to make meaningful efforts to access additional resources, for example, to ask the sheriff to provide additional security to facilitate more trials at Civic Center, seek alternative venues in which to hold trials, request visiting judges to help reduce the backlog, or endeavor to hire temporary employees or retrain existing ones to remedy its clerk and court reporter shortages.

Plaintiffs allege that these failures violate duties imposed upon defendants by Penal Code section 1050, subdivision (a),[5] specifically: to expedite criminal cases "to the greatest degree that is consistent with the ends of justice" (*ibid.*); and to give criminal trials "precedence over . . . any civil matters or proceedings" (*ibid.*), including by organizing its civil and criminal departments and workload so as not to "shortchange the court's criminal caseload" (*People v. Engram* (2010) 50 Cal.4th 1131, 1156 (*Engram*)).

In addition, defendant court allegedly facilitated routine violations of procedural statutes (§§ 1049.5, 1050, subds. (b), (i)) enacted to promote the timely disposition of criminal cases. These statutes permit the continuance of felony trials beyond the statutory trial deadline *only* upon an evidentiary showing of the necessity of a continuance, and only for the period proven necessary. However, instead of conducting genuine evidentiary hearings and making case-specific factual findings demonstrating good cause for a

---

[5] All undesignated statutory citations are to the Penal Code. For brevity, we refer to subdivision (a) of section 1050 as section 1050(a).

continuance beyond the statutory trial deadline, as these provisions require, judges routinely continued felony trials months beyond the statutory deadline based upon the court's recitation of a generic, unsworn "good cause" script, by an anonymous author that defendants could not cross examine, enumerating "facts" that the parties could not challenge.

Plaintiffs' taxpayer cause of action, based upon both Code of Civil Procedure section 526a and the common law doctrine of taxpayer standing identified in *Silver v. Los Angeles* (1961) 57 Cal.2d 39 (*Silver*), alleges defendants are "illegally expending, wasting and injuring public funds by performing their duties in violation of . . . sections 686(1), 1049.5 and 1050 [and the speedy trial clauses of the state and federal constitutions]." The failure to prioritize criminal cases caused the public to incur "increased security, staff and facility costs for multiple pretrial court appearances," increased pretrial-incarceration costs, and "increased costs for the public defender, district attorney, and witnesses employed by [public] agencies."[6]

In addition to seeking the (now abandoned) writ of mandate, plaintiffs demand a permanent injunction requiring all defendants to, inter alia, give criminal trials priority over non-specialized civil matters,[7] to set them without regard to the pendency of such civil matters, to make all non-specialized civil courtrooms in Civic Center available for criminal trials, and

---

[6] On demurrer, the trial court dismissed plaintiffs' remaining causes of action for a writ of mandate (Code Civ. Proc., § 1085, subd. (a)) to compel defendants to comply with assertedly ministerial duties to devote more resources to holding criminal trials, as well as a civil cause of action purportedly arising directly under the speedy trial clause (Cal. Const., art. I, § 15). Plaintiffs do not appeal from this aspect of the order.

[7] We assume that by "specialized" civil matters plaintiffs mean probate, juvenile justice, juvenile dependency, and family law proceedings.

to implement a plan to remediate the backlog.[8] They also seek a declaration that defendants' conduct violates the cited statutes and constitutional provisions, which "require [defendants] to act as set forth above." Plaintiffs, however, "do not challenge or seek to remedy any order in any particular criminal case. Nor do they seek dismissal of any case."

Defendants demurred, contending, among other things, that plaintiffs lack taxpayer standing because they are not criminal defendants, who can assert their own speedy trial rights in their own cases. Defendants also purported to demur to plaintiffs' requests for injunctive and declaratory relief. Finally, they argued that plaintiffs' decision to forgo a remedy in any pending (criminal) case divests this case of any "present controversy" and, thus, any basis for declaratory relief.

The trial court[9] sustained the demurrer without leave to amend. Citing precedents holding that one superior court cannot direct a writ of mandamus to another such court (or itself),[10] the trial court ruled that plaintiffs could seek mandamus relief only in the court of appeal.[11] Then, it extended those

---

[8] However, plaintiffs' counsel clarified at oral argument that with respect to the taxpayer cause of action, plaintiffs primarily seek declaratory relief and will seek injunctive relief only "if necessary." (See fn. 29, *post*.)

[9] All judges of defendant court disqualified themselves and this case was assigned to a judge of Contra Costa County Superior Court.

[10] See *Ford*, *supra*, 188 Cal.App.3d at page 742; *Haldane v. Superior Court of Los Angeles County* (1963) 221 Cal.App.2d 483, 485–486; *People v. Davis* (2014) 226 Cal.App.4th 1353, 1371; *Alvarez v. Superior Court* (2010) 183 Cal.App.4th 969, 983.

[11] Plaintiffs later filed such a petition invoking this court's original jurisdiction, which we summarily denied. Defendants seek judicial notice of this petition and this court's order, but do not argue that such a denial can have any preclusive effect. Nor can they. (*Kowis v. Howard* (1992) 3 Cal.4th

same precedents to the remaining claims, reasoning that they "do not merely apply in the context of a petition for writ of mandate . . . but hold that as a general matter, one superior court lacks the power to compel or restrain the actions of another superior court." On that basis alone, the court concluded that its "lack of authority to issue any relief directed at another superior court judge is fatal to *all* of [plaintiffs'] claims, and cannot be remedied by any amendment." (Italics added.) The court sustained the demurrer without leave to amend and, after entry of judgment, plaintiffs timely appealed.

## Standard of Review

"We review de novo an order sustaining a demurrer, assessing whether the complaint states a cause of action. (*Minton v. Dignity Health, supra,* 39 Cal.App.5th at p. 1161.) We accept all properly pleaded material facts, but not contentions, deductions, or conclusions of fact or law. (*Ibid.*) 'We affirm if any ground offered in support of the demurrer was well taken but find error if the plaintiff has stated a cause of action under any possible legal theory. [Citation.] We are not bound by the trial court's stated reasons . . . ; we review the ruling, not its rationale.' " (*Amy's Kitchen, Inc. v. Fireman's Fund Ins. Co.* (2022) 83 Cal.App.5th 1062, 1067 (*Amy's Kitchen*).)

We also assume the truth of judicially noticeable facts. (Code Civ. Proc. § 430.30, subd. (a).) Defendants request judicial notice of documents from plaintiffs' mandamus proceeding in this court (see fn. 11, *ante*), and of various documents related to motions to dismiss on speedy-trial grounds filed by specific detainees mentioned in this case. Defendants assert that the documents "refute allegations made in [the] complaint" but they do not request judicial notice of any specific fact appearing in a judicially noticeable

888, 899; *Franchise Tax Bd. Limited Liability Corp. Tax Refund Cases* (2018) 25 Cal.App.5th 369, 387, fn. 7.)

8

court document; nor do they identify the purportedly "refuted" allegations.[12] Defendants also assert that the proffered documents support their arguments about "available and adequate remedies to the individual criminal defendants" but no examples are needed to prove the existence of remedies the Penal Code expressly provides (§ 1382) and, as we explain (see p. 35, *post*), the underlying legal premise is unavailing. We therefore deny the request.

## Analysis

Plaintiffs' taxpayer cause of action is based upon asserted violations of section 1050(a) (imposing a duty to expedite criminal proceedings, including by giving them priority over civil proceedings, to the greatest degree that is consistent with the ends of justice); and sections 1050, subdivisions (b) through (i), and 1049.5 (together, requiring felony trials to commence within 60 days of arraignment, absent a finding, after a hearing, of good cause based upon admissible evidence); as well as constitutional provisions conferring a right to speedy trial. As we conclude that plaintiffs have stated a cause of action premised upon alleged violations of section 1050(a), we focus on that theory.

### 1. *Ford* Does Not Bar Plaintiffs' Cause of Action

Defendants contend the trial court correctly relied upon *Ford, supra*, 188 Cal.App.3d 737*,* to sustain their demurrer to the taxpayer cause of action.[13] They concede, contrary to the trial court's apparent reasoning, that

---

[12] Defendants have also failed to provide legal authority, and we are aware of none, authorizing us to take judicial notice of the truth of facts recited in otherwise judicially noticeable documents. (*Johnson & Johnson v. Superior Court* (2011) 192 Cal.App.4th 757, 768.)

[13] While the court referred to four mandamus cases (see fn. 10, *ante*) in asserting that the taxpayer-standing cause of action was likewise barred,

*Ford* does not hold that a superior court judge can never "issue any relief directed at another superior court judge" or "lacks the power to compel or restrain the actions of another superior court." Nonetheless, they assert that, read more narrowly, *Ford* still bars plaintiffs' taxpayer-standing claim. We disagree.

In *Ford*, plaintiffs filed an action seeking "an order restraining [the court and its clerk] from carrying out and executing the judgment which had been entered by" a different department of the same superior court in a separate action. (*Ford*, *supra*, 188 Cal.App.3d at p. 741.) The *Ford* action was dismissed pursuant to demurrer. (*Ibid*.) In affirming the dismissal, the Second Appellate District reasoned, "The complaint states no cause of action. In reality, it seeks to have one department of the superior court review and restrain the judicial act of another department of the superior court. That cannot be done." (*Ibid*.)

Defendants simply stop here, contending this general principle bars challenges to any conduct fairly characterized as "judicial," such as a presiding or supervising judge's decision to designate particular departments for criminal or civil trials, or to distribute and sanction the use of a standardized "script" to facilitate routine continuances beyond the statutory last date. This argument, however, ignores the procedural posture in *Ford,* in which the plaintiff filed suit to challenge a judicial decision in an individual case, *after* it had been " 'assigned for hearing and determination to one department,' " leading the court to hold: "One department of the superior court cannot enjoin, restrain, or otherwise interfere with the judicial act of another department . . . ." (*Id.* at pp. 741–742.) Rather, "[a]ppellate

---

defendants on appeal rely solely on *Ford*, implicitly conceding that the other three are inapposite. We agree.

10

jurisdiction to review, revise, or reverse decisions of the superior courts is vested by our Constitution only in the Supreme Court and the Courts of Appeal." (*Id.* at p. 742.)

Here, as the trial court acknowledged, plaintiffs do not seek to review, revise, or reverse any decision in an individual criminal case. Rather, they challenge courtwide decisions regarding allocation of judges, courtrooms, and other resources, as well as the creation and circulation to criminal departments of a "script" to be utilized in resolving speedy trial motions in lieu of compliance with statutorily-mandated procedural requirements.

*Ford* further observed that the plaintiffs' proper remedy was "by way of intervention in the main case, and, in the event of an adverse decision there, an appeal to this court." (*Ford*, *supra*, 188 Cal.App.3d at p. 742.) As we have explained, however, plaintiffs have neither the desire nor the ability to intervene in the underlying criminal proceedings and have disavowed any intent to modify any order or judgment entered in a criminal case. And contrary to defendants' assertions, the sought-after relief does not threaten to upset individual, fact-specific, discretionary decisions on speedy trial motions (to continue a trial beyond its statutory "last day" or to dismiss a case for failure show good cause for such continuance) in individual criminal cases, or to alter the well-established procedural and substantive rules governing such motions. As such, neither the rule nor the underlying rationales of *Ford* apply to bar plaintiffs' taxpayer cause of action.

2.     **Defendants' Alternative Arguments**

Despite the trial court's erroneous application of *Ford*, the judgment will not be reversed if we find the demurrer should have been sustained based upon any of defendants' alternative "ground[s] offered in support of the demurrer" and reiterated on appeal. (*Amy's Kitchen*, *supra*, 83 Cal.App.5th at

11

p. 1067.) To evaluate these theories, we first examine the two forms of taxpayer standing and the various Penal Code provisions upon which the taxpayer claim is premised.

### a. *Taxpayer Standing Claims Against Courts and Judges*

"[A] taxpayer can bring suit against governmental bodies in California under either of two theories, one statutory, the other based upon the common law. Section 526a of the Code of Civil Procedure provides, in part, that 'An action to obtain a judgment, restraining and preventing any illegal expenditure of, *waste of*, or injury to, the estate, *funds*, or other property *of a county, town, city or city and county of the state*,[14] may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein.' (Italics added.) This provision is to be compared to and contrasted with the common law authority for taxpayer suits, as stated in *Silver*[, *supra*,] 57 Cal.2d [at pages] 40–41 that a 'taxpayer in his representative capacity can sue a municipality *only* in cases involving *fraud, collusion, ultra vires, or a failure on the part of the governmental body to perform a duty specifically enjoined*.' (Italics added.)" (*Los Altos Property Owners Assn. v. Hutcheon* (1977) 69 Cal.App.3d 22, 26.)

Defendants mainly challenge the sufficiency of plaintiffs' Code of Civil Procedure section 526a claim (statutory taxpayer claim). First, they assert

---

[14] The Legislature amended the statute in 2018, replacing the original list of local entities with the phrase "local agency," and defining that term to mean "a city, town, county, or city and county, or a district, public authority, or any other political subdivision in the state." (Stats. 2018, ch. 319, § 1.) Defendants do not contend that the 2018 amendment narrowed the statute's scope as determined by prior caselaw.

that they are not subject to a statutory claim because they are not identified in the statute as a covered entity. This argument is, frankly, specious. Although the statute "on its face, only applies to towns, cities, counties, and cities and counties of the state," our courts have "consistently held that the statute is to be liberally construed" to also apply to state officials and agencies. (*Los Altos Property Owners Assn. v. Hutcheon, supra*, 69 Cal.App.3d at pp. 27–28 & p. 27, fn. 5, citing *Stanson v. Mott* (1976) 17 Cal.3d 206, 222–223; *Serrano v. Priest* (1971) 5 Cal.3d 584, 618, fn. 38; *Blair v. Pitchess* (1971) 5 Cal.3d 258, 267–268 (*Blair*); *California State Employees' Assn. v. Williams* (1970) 7 Cal.App.3d 390, 395.) That proposition, settled decades ago, remains true today. (See, e.g., *Grosz v. California Dept. of Tax & Fee Admin.* (2023) 87 Cal.App.5th 428, 439 [applying statute to state agencies and officials].) For this reason, defendants' related contention that a superior court is "part of the state judicial branch," not a subagency of a county (*Jones v. County of Los Angeles* (2002) 99 Cal.App.4th 1039, 1045), is immaterial.

Defendants also argue that there is no authority specifically providing for the assertion of statutory taxpayer claims against a court or judge. However, they have not pointed to any policy of Code of Civil Procedure section 526a, or precedent construing it, that would warrant a judicially created exception to the well-established rule, simply because the case involves allegations of unlawful activity by a court or judicial officer.[15] (See,

---

[15] The parties debate whether dicta in *Van Atta v. Scott* (1980) 27 Cal.3d 424 (*Van Atta*) (plur. opn.), undercut by subsequent change in Cal. Const. as stated in *In re York* (1995) 9 Cal.4th 1133, 1143, fn. 7, implicitly permits statutory taxpayer claims against courts. *Van Atta* addressed a statutory taxpayer claim against San Francisco's police chief and sheriff (but no court or judge) challenging a pretrial release program. (*Id.* at p. 433.) The defendants cited two opinions rejecting taxpayer-standing

e.g., *R.S. v. PacifiCare Life & Health Ins. Co.* (2011) 194 Cal.App.4th 192, 207 [affirming judgment following demurrer because, "[a]t bottom, appellants seek a public policy exception to the [relevant law], but they cite no authority . . . for such an exception"].)

### b. *The Courts' Duties to Ensure Speedy Criminal Trials*

#### 1. *Constitutional and Statutory Provisions*

The federal and state Constitutions guarantee a criminal defendant a speedy trial. (U.S. Const., amend. 6; Cal. Const., art. I, § 15.) California law implements and protects that right through, inter alia, sections 686, subdivision (1) (restating the right) and 1382 (requiring dismissal, absent

---

actions against judges, *Di Suvero v. County of Los Angeles* (1977) 73 Cal.App.3d 718 (*Di Suvero*) and *Gould v. People* (1976) 56 Cal.App.3d 909 (*Gould*), for the proposition that the existence of directly affected persons who may challenge an allegedly illegal act bars taxpayer standing. (*Van Atta,* at p. 448.) The *Van Atta* court disapproved *Di Suvero* and *Gould* insofar as they supported that proposition. (*Id.* at p. 449.) Under a part of *Gould*'s holding approved in *Van Atta*, dismissal is proper if a litigant " '[files] a collateral action against a judge under the guise of a taxpayer's suit contesting the outcome of any civil or criminal action in which he [believes] the trial court ruled erroneously.' " (*Van Atta*, at p. 448.)

Plaintiffs argue that if a statutory taxpayer action against a court or judge does *not* amount to such a disguised collateral attack on a ruling in an individual case, *Van Atta* "strongly signals the viability" of such an action, in dicta that should be heeded. Were we to consider dicta, we might also note that Division Two of this court cited with approval a lower court's conclusion that, "defendant judges and sheriff are proper candidates for an injunction under . . . [Code Civ. Proc., § 526a], since these officers are the instrumentalities bringing about the allegedly illegal expenditure of funds through the enforcement of [certain] allegedly unconstitutional provisions of the Penal Code." (*Kawaichi v. Madigan* (1975) 53 Cal.App.3d 461, 464, fn. 2, disapproved on other grounds by *Van Atta*, *supra*, 27 Cal.3d at p. 446, fn. 19.) However, given defendants' failure to identify authority barring such actions as a matter of law, or a compelling reason to create a new rule to that effect, we need not decide how much weight, if any, we should give to dicta in these cases.

14

good cause, of felony cases not tried within 60 days of arraignment, and of misdemeanor cases not tried within 30 or 45 days of arraignment or plea, depending on custody status). When a defendant moves to dismiss pursuant to section 1382, the court must determine whether the People have demonstrated "good cause" for a continuance of trial beyond the statutory last day. (*Engram*, *supra*, 50 Cal.4th at pp. 1162–1163.) The court must consider all relevant circumstances of the particular case, including the nature and strength of the justification for delay, the duration of the delay, and the prejudice to defendant or the People that is likely to result from the delay. (*Ibid.*)

Two other statutory provisions featuring prominently in plaintiffs' taxpayer claim implement and enforce the state's policy in favor of speedy criminal trials more broadly, to further the rights and interests of all participants in criminal cases and of society as a whole. The first is section 1049.5, which requires the court to set felony criminal trials within 60 days of arraignment unless, after a hearing as set forth in section 1050, the court finds good cause for a later date. (§ 1049.5.)[16] This provision was enacted by the Crime Victims Justice Reform Act, a 1990 initiative measure intended "to restore balance to our criminal justice system, to create a system in which justice is swift and fair, and to create a system in which violent

---

[16] Subdivisions (b) to (i) of section 1050 set forth rules governing motions to continue criminal hearings, including trials. Such motions (§ 1050, subds. (b)–(d)) "shall be granted only upon a showing of good cause," and, at the end of a hearing on such a motion, a court "shall make a finding whether good cause has been shown" and, if so, "shall state on the record the facts proved that justify its finding" (*id.*, subds. (e) & (f)). Continuances are limited to a duration "shown to be necessary by the evidence considered at the hearing," and, when granted, "the court shall state on the record the facts proved that justify the length of the continuance . . . ." (*Id.*, subd. (i).)

15

criminals receive just punishment, . . . crime victims and witnesses are treated with care and respect, and . . . society as a whole can be free from the fear of crime . . . ." (Prop. 115, § 1(c), approved by voters on June 5, 1990; see *id.*, § 21 [enacting § 1049.5].) Rather than emphasize defendants' rights, the initiative focuses on swiftly punishing "violent criminals," protecting public safety, and fostering the welfare of victims and witnesses.

The second provision is section 1050(a), which imposes a "duty [on] all courts and judicial officers [and counsel] . . . to expedite [criminal] proceedings to the greatest degree that is consistent with the ends of justice." (§ 1050(a).) To that end, the provision further commands that criminal cases "shall be given precedence over, and set for trial and heard without regard to the pendency of, any civil matters or proceedings." (*Ibid.*) As we discuss below, while this provision has been construed to permit superior courts some latitude in managing their workload, including by designating specific courtrooms to preside over particular case types, it imposes the concomitant duty to do so in a manner that acknowledges the state interest in expeditious criminal proceedings and does not "shortchange the court's criminal caseload by creating or maintaining a disproportionately large number of civil as compared to criminal departments." (See pp. 17–21, *post*.)

Unlike section 1382, which was enacted to protect *defendants'* speedy trial rights, section 1050(a) acknowledges that the right to "expeditious disposition" of criminal cases inures broadly to "the people, the defendant, and the victims and other witnesses." It also "finds" that excessive continuances in criminal courts have "adverse consequences" not just to defendants, but "to the welfare of the people," cause "substantial hardship to victims and other witnesses," and can lead to "overcrowding and increased expenses of local jails."

Finally, a correlating California Rule of Court imposes on the presiding master calendar judge and on the court certain duties designed to reduce delays and minimize section 1382 dismissals. (Cal. Rules of Court, rule 4.115(a) ["To ensure that the court's policy on continuances is firm and uniformly applied . . . and that cases are tried on a date certain," a court not operating on direct calendar system must implement a master calendar system, in which the presiding judge of a master calendar department must conduct or supervise all arraignments and pretrial hearings and "assign to a trial department any case requiring a trial . . ."]; *id.,* rule 4.115(b) ["Active management of trial calendars is necessary to minimize the number of statutory dismissals. . . . Courts must implement calendar management procedures, in accordance with local conditions and needs, to ensure that criminal cases are assigned to trial departments before the last day permitted for trial under section 1382."].)

### *2.* **Engram** *and the Duty of a Court Under Section 1050(a)*

In *Engram*, *supra*, 50 Cal.4th 1131, the Supreme Court analyzed the duties imposed by section 1050(a), and considered how those duties interact with a court's case-specific obligations, under section 1382, to dismiss a criminal case if not timely brought to trial.

*Engram* concerned a trial court's decision to dismiss an individual criminal case in Riverside County Superior Court, which was then experiencing a massive, chronic backlog due to years of inadequate funding vis-à-vis the county's growth. A task force had been assembled to assess and assist with the backlog, and the court had devoted virtually all of its judges and courtrooms (including every civil department but family law, juvenile,

17

and probate[17]) to criminal trials. (*Engram*, *supra*, 50 Cal.4th at pp. 1136–1137.) On the statutory deadline to try Engram's case, a Riverside County judge found no courtroom available (for Engram or for the defendants in 17 other "last day" cases in which defense counsel had declared "ready") and concluded that the lack of courtrooms did not constitute "good cause" to extend the date to commence trial any further. (*Id.* at pp. 1140–1143.) To avert dismissal, the district attorney argued that section 1050(a) obliged the court, before dismissing the case, to consider sending the trial to a probate, juvenile or family law department, and argued in the alternative that if no department was available, that fact was good cause for a continuance. (*Id.* at p. 1141.) The court rejected both arguments and, upon motion, dismissed the action pursuant to section 1382. (*Id.* at pp. 1141–1144.)

The Supreme Court affirmed, observing that court and counsel are obligated to expedite criminal proceedings only "to the greatest degree that is *consistent with the ends of justice.*" (*Engram*, *supra*, 50 Cal.4th at pp. 1153–1156, 1150, quoting § 1050(a), italics added.) It held section 1050(a) could not be read to create "an absolute or inflexible rule mandating such precedence [for criminal cases] under all circumstances." (*Id.* at p. 1151.) In so doing, the court rejected the prosecution's contention that the Riverside court could not categorically exempt its specialized civil departments (family, probate and juvenile) from trying last-day criminal cases, and was obligated to compare, on a case-by-case basis, the relative urgency of each criminal trial with the matter(s) pending in those departments. (*Engram*, *supra*, 50 Cal.4th at pp. 1153–1154.) The court reasoned that section 1050(a) "does not preclude a

---

[17] Other civil matters were tried by out-of-county judges temporarily assigned to a facility at an elementary school, which lacked adequate security for criminal trials, and by one judge whom the district attorney had blanket-challenged in criminal cases. (*Engram, supra,* 50 Cal.4th at pp. 1144, 1158.)

trial court . . . from designating separate departments to handle criminal and civil matters and, *within reasonable limitations*, assigning cases for trial only within the appropriate department." (*Id.* at p. 1154, italics added.) Those "reasonable limitations," under applicable precedents, "require a trial court to organize its civil and criminal departments and workload in a manner that (1) acknowledges the important state interest in the expeditious resolution of criminal proceedings as reflected in section 1050, and (2) does not shortchange the court's criminal caseload by creating or maintaining a disproportionately large number of civil as compared to criminal departments." (*Engram*, *supra*, 50 Cal.4th at pp. 1156–1157 [citing authorities].)

In one of those precedents, this court suggested 70 years ago that defendant court had violated section 1050(a) despite devoting a somewhat *higher* percentage of its departments to criminal trials than it allegedly did in 2021. (*People v. Echols* (1954) 125 Cal.App.2d 810 (*Echols*), disapproved on another ground in *People v. Wilson* (1963) 60 Cal.2d 139, 152.)[18] There, "the trial court found good cause to continue [a] trial beyond the statutory period on numerous occasions, based solely upon the circumstance that *in the particular criminal trial department to which the defendants' case initially had been assigned* there were older cases that were then in trial or [scheduled for trial]." (*Engram*, s*upra*, 50 Cal.4th at p. 1156.) The *Echols* court noted the absence of any showing why the case "could not have been tried in one of the other criminal departments" and added that, even assuming they all were

_____

[18] In *Echols*, defendant court had devoted 17 percent of its departments to criminal matters (*Echols, supra,* 125 Cal.App.2d at pp. 815-816); by comparison, in 2021, it nominally devoted only 14 percent of its courtrooms to, and actually used only 8 to 11 percent of its courtrooms for conducting such trials.

busy, defendant court then had 23 departments, of which only four (or 17 percent) were devoted to criminal trials, and "more departments could be assigned criminal cases." (*Echols*, *supra*, at pp. 815–817.) " 'To comply with the provision contained in section 1050 . . . that criminal matters should be given precedence over civil matters and to enable defendants in criminal actions to have the speedy trials . . . guaranteed by the Constitution, a greater number of judges should have been assigned to departments handling criminal matters.' " (*Id.* at p. 816.) In a mandamus proceeding resolved a week before *Echols*, this court issued a writ compelling defendant court to dismiss a case pursuant to section 1382, while paraphrasing an opinion to similar effect by the Second District: "To comply with the provision contained in section 1050 . . . that criminal matters should be given precedence over civil matters and to enable defendants . . . to have the speedy trials . . . guaranteed by the Constitution, a greater number of judges should have been assigned to departments handling criminal matters. There are 22 judges in [defendant court], and the showing that a large number of civil cases were pending does not excuse the failure to assign a sufficient number of judges to handle criminal matters." (*Sigle v. Superior Court* (1954) 125 Cal.App.2d 747, 748–749, citing *Dearth v. Superior Court* (1940) 40 Cal.App.2d 56, 59.)

The *Engram* court found that, unlike the trial courts in *Echols*, *Dearth*, *Sigle*, and another similar case,[19] the Riverside court had not "shortchanged

---

[19] Along with *Echols* and *Dearth*, *Engram* discussed another opinion of similar vintage, noting that all of those precedents "demonstrate that a superior court may run afoul of section 1050 if it shortchanges criminal matters and does not devote a reasonable proportion of its resources to the trial of criminal cases." (*Engram, supra*, 50 Cal.4th at pp. 1137–1138; see also *id.* at p. 1157, discussing *Stewart v. Superior Court* (1955) 132 Cal.App.2d 536 [court violated section 1050(a) by assigning only 8 of 59 judges to criminal

criminal cases by reserving an unreasonably high number or proportion of judges or courtrooms exclusively for the trial of civil matters"; rather, it had "continually granted substantial precedence to criminal cases over civil cases, utilizing virtually all of the court's ordinary civil department judges and courtrooms for the trial of criminal cases." (*Engram, supra,* 50 Cal.4th at p. 1157.)

The *Engram* court also criticized other decisions for their "fail[ure] to recognize that the question whether a trial court's policies and practices with regard to the processing of criminal and civil matters violate the provisions of section 1050 is *separate and distinct* from the question whether good cause exists to delay a criminal defendant's trial for purposes of the statutory speedy-trial provisions of section 1382." (*Engram, supra,* 50 Cal.4th at p. 1160, italics added.) "[E]ven . . . when there is adequate justification for the trial court's decision not to preempt the trial of a civil matter in favor of a last-day criminal proceeding," that is, no violation of section 1050, "it still may be the case that the lack of a number of judges or courtrooms sufficient to try the criminal case within the presumptive statutory period will not constitute good cause for purposes of section 1382 and thus will not be an appropriate basis for refusing to dismiss the criminal proceeding under section 1382." (*Ibid.*) As discussed below (see pp. 32–35, *post*), defendants similarly conflate these inquiries.

The *Engram* court then rejected the district attorney's argument that the lack of an available courtroom constituted good cause under section 1382 to delay the trial. (*Engram, supra*, 50 Cal.4th at pp. 1162–1165.) While the Riverside court's organizational and workload policies had not violated

_____

trials and sending 29 civil cases to trial on the dates it continued defendant's criminal trial] and *Dearth v. Superior Court, supra*, 40 Cal.App.2d at p. 59.)

21

section 1050(a), the inability to commence trial was nonetheless attributable to the state's failure to supply sufficient judges and courtrooms to timely try criminal cases. (*Id.* at pp. 1164–1165.) While this "might constitute good cause to justify the delay of trial under section 1382 in 'exceptional circumstances,'" (which it described as "unique, nonrecurring events" that produce "an inordinate number of cases"), the Supreme Court concluded that "delay arising out of *chronic* congestion of a court's trial docket cannot be excused." (*Id.* at pp. 1163–1164 & fn.12, citing *People v. Johnson* (1980) 26 Cal.3d 557, 571–572, italics added.)[20]

### 3. Recent Decisions Assessing Case-Specific Section 1382 Rulings in Light of Engram

Defendants cite two recent decisions denying mandamus petitions filed by criminal defendants seeking dismissal of their individual cases under section 1382. In *Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108 (*Hernandez-Valenzuela*), our colleagues in Division Three considered defendants' response to the pandemic and efforts to reduce the backlog in the same period of time at issue in this case. (*Id.* at pp. 1117–1120.) *Hernandez-Valenzuela* differed from this appeal, however, in two fundamental ways. First, Division Three had before it an evidentiary record enabling it to resolve factual disputes going to the question of good cause for

---

[20] In *Johnson*, the court also distinguished between predictable, chronic causes for delay, on one hand, versus "unforeseen events," such as sudden illness, on the other; and held that "exceptional circumstances" which could justify a delay of trial do not include routine overassignment of cases to public defenders, which would "foreseeably . . . result in the delays of trials." (*Johnson, supra*, 26 Cal.3d at pp. 570–572.) Similarly, the Supreme Court has observed that a trial court's failure to prepare for and address predictable obstacles cannot support a good cause finding for continuance, rather than dismissal. (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1201–1202.) Rather, court administrators must plan for these contingencies. (*Id.* at p. 1201.)

delay. Here, our only inquiry is the sufficiency of the pleadings. Second, in *Hernandez-Valenzuela*, the dispositive question was not simply whether defendant court had discharged its duty under section 1050(a) to avoid "shortchang[ing] the court's criminal caseload by creating or maintaining a disproportionately large number of civil as compared to criminal departments." (*Engram*, *supra*, 50 Cal.4th at p. 1156.) Rather, the inquiry was whether the trial court, in continuing defendants' trials beyond their statutory last dates, abused its discretion, an analysis which turned on a consideration of all relevant circumstances *in the specific cases at issue*, including not only the nature and strength of the reason for the delay, but also the extent of the delay beyond each defendant's statutory last date, and the prejudice a party would likely suffer by virtue of the delay. (*Hernandez-Valenzuela*, at p. 1124; see also *Engram*, *supra*, at p. 1160 [observing that these two questions are "separate and distinct"].)

Having considered the evidence, a divided panel held that although defendant court's failure to utilize courtrooms was "startling and troubling," it was not unreasonable that, by the fall of 2021, the backlog persisted despite defendants' efforts; and that the length of the delay of each defendant's trial was short, relative to the delays in *Engram*. Thus, there was no abuse of discretion in finding good cause to continue petitioners' trials. (*Hernandez-Valenzuela*, *supra*, 75 Cal.App.5th at pp. 1127, 1131–1132.)

A vigorous dissent concluded that the good-cause findings *did* constitute an abuse of discretion. (*Hernandez-Valenzuela*, *supra*, 75 Cal.App.5th at p. 1136 (dis. opn. of Tucher, P. J.).) The People had not borne their burden of proving good cause to delay trial beyond the statutory last day. (*Id.* at p. 1142.) While the existence of a backlog when trials resumed in June 2021 had been inevitable, the court had not "react[ed] with

23

urgency" or implemented obvious, common-sense measures to address the backlog, instead "allow[ing] the trial departments at the Hall of Justice to limp along at half strength," so "that the backlog of felony cases actually grew." (*Id.* at p. 1138, 1141–42.) Further, the decision to delay petitioners' trials plainly inflicted "significant" prejudice on petitioners, in part due to their prolonged pretrial incarceration under additional restrictions necessitated by the pandemic. (*Id.* at p. 1140 & fn. 4.)[21]

Recently, Division One denied two more mandamus petitions alleging that judges of defendant court abused their discretion in finding good cause to continue petitioners' trials beyond their statutory last day and declining to grant petitioners' section 1382 motions to dismiss. (*Estrada v. Superior Court* (2023) 88 Cal.App.5th 1096, 1101 (*Estrada*).) After summarizing *Hernandez-Valenzuela*'s majority opinion (*id.* at pp. 1101–1103, 1106–1112), Division One found—again based on an evidentiary record—that in 2022 defendants had made some progress in reducing the backlog, increased the percentage of Hall of Justice courtrooms actually in use from roughly 30 percent to 73 percent, and implemented many of the remedial measures proposed in *Hernandez-Valenzuela*.[22] (*Id.* at pp. 1112–1115, 1122–1123.) After "considering the totality of the circumstances," it found that petitioners' cases were delayed due to "the continuing sequelae of the COVD-19 pandemic" and,

---

[21] Unlike the dissent, the majority opinion did not address the prejudice occasioned by the trial court's decisions to continue petitioners' trials beyond their statutory last dates or explain how that factor weighed in the analysis.

[22] Not only was *Estrada* decided based upon markedly improved courtroom-utilization rates since the timeframe addressed in *Hernandez-Valenzuela*, the *Estrada* petitioners did not (unlike plaintiffs here) attribute the backlog to defendants' failure to try criminal cases at Civic Center. (*Estrada, supra,* 88 Cal.App.5th at p. 1115.) Rather, they blamed judicial vacations and a "remarkably inefficient trial assignment system." (*Id.* at p. 1112.)

24

as such, there was no abuse of discretion in finding good cause to continue petitioners' trials or in declining to dismiss the cases. (*Id.* at pp. 1117–1118, 1121, 1124.)

Defendants do not contend that either of these cases has preclusive effect or establishes some legal principle that would bar plaintiffs' claims as a matter of law. Nor do they suggest we could take judicial notice of the truth of any factual findings in those cases in a way that would somehow render plaintiffs' claims insufficiently pleaded. As such these opinions are relevant, at best, as background.

### c. *The Complaint Sufficiently Alleges a Common Law Taxpayer Claim*

While conceding that they are subject to common law taxpayer-standing actions, defendants contend that plaintiffs have not pleaded the necessary facts to establish such a claim—that is, facts showing "fraud, collusion, ultra vires, or a failure on the part of the governmental body to perform a duty specifically enjoined." (*Silver, supra,* 57 Cal.2d at pp. 40–41.) In our view, however, plaintiffs' factual allegations, if proven, could lead a trier of fact to conclude that one or more defendants failed "to perform a duty specifically enjoined" (*ibid.*)—that is, the duty to ensure that criminal cases are given precedence over, and set for trial regardless of the pendency of, civil matters "to the greatest degree that is consistent with the ends of justice" (§ 1050(a)). As discussed below, while this duty is not absolute or inflexible, it requires all courts to "organize [their] civil and criminal departments and workload in a manner that (1) acknowledges the important state interest in the expeditious resolution of criminal proceedings as reflected in section 1050, and (2) does not shortchange the court's criminal caseload by creating or maintaining a disproportionately large number of civil as compared to criminal departments." (*Engram, supra,* 50 Cal.4th at p. 1156; see pp. 17–22,

25

*ante*.) The facts alleged, if proven, could lead a trier of fact to find that, many months into the pandemic, defendants failed to take feasible, common-sense measures to devote adequate resources to criminal trials, and thus failed to adequately prioritize criminal cases over civil matters, in ways that exacerbated the backlog and "shortchanged" defendant court's criminal caseload. Thus, plaintiffs "state[] a cause of action under [a] possible legal theory." (*Amy's Kitchen, supra*, 83 Cal.App.5th at p. 1067.)

Citing subdivision (*l*) of section 1050, defendants contend that the duty imposed by section 1050(a) cannot serve as a basis for common law taxpayer relief because the duty is "directory" only, not mandatory, and thus there is no "duty specifically enjoined" upon them. (See § 1050, subd. (*l*) ["This section is directory only and does not mandate dismissal of an action by its terms"].) This very argument was refuted, however, in *Engram*, in which the court explained that the term "directory" as used in subdivision (*l*) does not mean— as it can in other legal contexts—that "the sentence in section 1050 granting precedence to criminal cases over civil cases is . . . merely directive rather than compulsory," but simply that the statute does not mandate *dismissal* of a case as a remedy for a violation. (*Engram, supra*, 50 Cal.4th at p. 1151 & fn. 8, citing § 1050, subd. (*l*).) Indeed, section 1050 observes that the remedy of dismissal is provided for in section 1382. (§ 1050, subd. (j).) The duty imposed by section 1050(a) is in fact mandatory.[23]

---

[23] In *People v. Brown* (2023) 14 Cal.5th 530, the Supreme Court analyzed subdivision (e) of section 1050, one of the provisions governing requests for continuances in specific cases (§ 1050, subds. (b)–(i)), which states that "[c]ontinuances shall be granted only upon a showing of good cause." The question was whether, when "good cause" for a continuance is not shown, the court must deny a continuance even when that will foreseeably result in dismissal of the action. (14 Cal.5th at pp. 533–534, 537.) Consistent

26

Plaintiffs allege that defendants maintained a disproportionately large number of civil departments in the face of a mounting backlog of criminal trials and failed to devote sufficient resources to staff and operate the small fraction of departments they *did* devote to criminal trials, causing a significant number of criminal cases to be continued months past their statutory "last date" for trial. They have therefore pleaded a prima facie case that defendants shortchanged the court's criminal caseload in violation of "a duty specifically enjoined" on them by section 1050(a).

### d. The Complaint Sufficiently Alleges a Statutory Taxpayer Claim

Defendants also challenge the adequacy of plaintiffs' *statutory* taxpayer-standing cause of action. While not dispositive of this appeal, given our holding that plaintiffs have adequately pleaded a common law claim, we exercise our discretion to provide guidance on remand.

### 1. Plaintiffs Have Pleaded "Waste" or "Illegal Expenditure" of Public Funds

Code of Civil Procedure section 526a, subdivision (a) permits actions to restrain "any illegal expenditure of, waste of, or injury to, the estate, funds, or other property" of a covered public agency. Defendants deny that plaintiffs

---

with *Engram*, the court cited subdivision (*l*), describing section 1050 as "directory," and reasoned that subdivision (e) does not require denial where it would result in dismissal, since subdivision (*l*) specifies that section 1050 does not mandate dismissal as a remedy for a violation. (*Id.* at p. 538.) The court quoted with approval the passage in *Engram* distinguishing the two senses of the term "directory" (*ibid.*, fn. 3, quoting *Engram*, *supra*, 50 Cal.4th at p. 1148, fn. 7), and did not call into question *Engram*'s holding that the duty set forth in subdivision (a) to give criminal cases calendar priority over civil cases "to the greatest degree that is consistent with the ends of justice" is mandatory in the sense of compulsory, and directory in the sense that section 1050 does not mandate dismissal as a remedy for a violation. (*Engram*, at p. 1151.)

have pleaded "waste." Initially, they argue plaintiffs allege only expenditures by *other* entities occasioned by defendant court's backlog and resultant continuances. However, plaintiffs allege that defendants' failure to prioritize criminal cases has caused, inter alia, "increased security, staff and facility costs for multiple pretrial court appearances." In any event, Code of Civil Procedure section 526a permits challenges to "illegal expenditure" of public funds, regardless of their amount or whether "the illegal procedures actually permit a *saving* of tax funds." (*Wirin v. Parker* (1957) 48 Cal.2d 890, 894, italics added.)

Indeed, ample precedent permits the use of Code of Civil Procedure section 526a to challenge an agency's expenditure of funds for activity carried out in a manner violative of constitutional or statutory provisions, even if the expenditure also produces some public benefit. (See, e.g., *Blair, supra,* 5 Cal.3d at pp. 267–269 [authorizing statutory taxpayer challenge to constitutionality of "claim and delivery law" permitting pre-adjudication seizure of property; if law were unconstitutional, "then county officials may be enjoined from spending their time carrying out its provisions"]; *Wirin v. Parker*, *supra*, 48 Cal.2d at pp. 891, 894 [authorizing statutory taxpayer challenge to police chief's operation of hidden-microphone surveillance program for "injunction against the expenditure of public funds in violation of . . . constitutional guarantees"]; *People for Ethical Operation of Prosecutors and Law Enforcement v. Spitzer* (2020) 53 Cal.App.5th 391, 395–396, 401–402 (*Spitzer*) [authorizing statutory taxpayer suit "to enforce constitutional duties" by restraining district attorney and sheriff's operation of confidential informant program, which allegedly elicited confessions by violating detainees' constitutional rights, as expenditures on unlawful program could amount to waste]; *California DUI Lawyers Assn. v. California Department of*

28

*Motor Vehicles* (2018) 20 Cal.App.5th 1247, 1251 [taxpayers could challenge operation of license-revocation hearing program conducted in a manner that allegedly violated due process].) *In other words, no depletion of funds is required where the complained-of activity is itself unlawful.* "[T]he mere expenditure of the *time* of [public employees] is a sufficient expenditure of public funds to be subject to injunction under [Code of Civil Procedure] section 526a." (*Blair*, *supra*, 5 Cal.3d 258, 285, fn. 21, italics added.) Having alleged that defendants have organized the court's workload in a manner which violates section 1050(a), plaintiffs have stated a statutory taxpayer claim for "waste."

### 2. Plaintiffs Do Not Impermissibly Challenge a Discretionary Act

Defendants also contend statutory taxpayer claims may not be based on "alleged mistake[s] by public officials in matters involving the exercise of judgment or wide discretion." (*Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1138 (*Sundance*).) *Sundance* involved a challenge to the enforcement of a public intoxication statute as a waste of public funds, given proof that an alternative, treatment-based civil approach would more efficiently remedy the societal harms at issue. (*Id.* at pp. 1108–1116.) The Supreme Court held that Code of Civil Procedure section 526a may not be utilized to enjoin expenditures merely because they are unwise, reflect poor policy, or do not produce sufficient benefit. (*Id.* at pp. 1138–1139.) Enforcement of the criminal statute at issue could not be considered "waste" because the allegations and findings "do not indicate that criminal enforcement of [the statute] provides no public benefit," but "only that the civil detoxification alternative would be a more prudent allocation of funds." (*Id.* at p. 1139.) "Therefore, the County's decision to continue arresting and detaining chronic alcoholics does not constitute waste, but merely an 'alleged mistake by public

officials in matters involving the exercise of judgment or wide discretion.' [Citation.] This court should not interfere with the County's legislative judgment on the ground that the County's funds could be spent more efficiently." (*Ibid*.)

Defendants, however, fail to address the separation-of-powers rationale for the holding of *Sundance*, which prohibits the use of Code of Civil Procedure section 526a "to invade, supersede, or even intrude upon the discretion invested in the *legislative and executive* branches." (*Humane Society of the United States v. State Bd. of Equalization* (2007) 152 Cal.App.4th 349, 356–358, italics added; accord, *Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1558 ["the limitations inherent in [Code of Civil Procedure] section 526a actions are founded in the separation of powers principle of our tripartite system of government"].) This omission is surprising, given their acknowledgment that *Sundance* precludes statutory taxpayer claims challenging " 'the exercise of the discretion of either the legislative or executive branches of government,' " (quoting *Schmid v. City and County of San Francisco* (2021) 60 Cal.App.5th 470, 495–496 (*Schmid*)).[24]

Defendants also cite authorities holding that a public entity's "exercise of discretion . . . cannot provide the foundation for taxpayer claims." (See *Chodosh v. Commission on Judicial Performance* (2022) 81 Cal.App.5th 248, 267–269 (*Chodosh*); *Schmid, supra,* 60 Cal.App.5th at pp. 495–496; *San Bernadino County v. Superior Court* (2015) 239 Cal.App.4th 679 (*San Bernadino*).) In applying this principle to plaintiffs' claims, however, defendants mischaracterize the type of "discretion" that removes

---

[24] None of defendants' precedents extend the *Sundance* rule, grounded in separation of powers, to a taxpayer action challenging *judicial* acts.

governmental conduct from the ambit of Code of Civil Procedure section 526a. The rule is that " '[t]axpayer suits are authorized only if the government body has a duty to act and has refused to do so. If it has discretion and chooses not to act, the courts may not interfere with that decision.' " (*San Bernadino*, at p. 686; accord, e.g., *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1281.) Where the government has a *duty* to act, *Sundance* does not preclude a statutory taxpayer claim merely because fulfilling the duty involves some exercise of discretion.

*Chodosh, Schmid*, and *San Bernardino* are inapposite, here, as each barred a taxpayer challenge to an official's policy decision whether or not to perform a *discretionary* act, not a failure to discharge a mandatory duty that involved some discretion in the manner of performance. In *San Bernadino*, the "discretionary act" that the court held to be beyond the reach of a taxpayer-standing action was " 'a government entity's decision whether to pursue a legal claim.' " (*San Bernadino*, *supra*, 239 Cal.App.4th at p. 686.) In so holding, *San Bernadino* cited, as an exception that proved the rule, cases in which plaintiffs *properly* premised taxpayer actions upon a public body or official's failure to pursue a legal claim in circumstances in which the defendant had a mandatory duty to pursue the claim. (*San Bernadino*, at p. 687, quoting *Schaefer v. Berinstein* (1956) 140 Cal.App.2d 278, 292–293 [action may proceed against city officials for failure to declare certain transactions void where city charter provision required city council to declare such transactions void]; *Miller v. McKinnon* (1942) 20 Cal.2d 83, 86–87, 95 [taxpayer action may be premised upon failure of county district attorney to comply with statute that " 'made his imperative duty, to institute suit, in the

31

name of the county' "].)[25] Here, defendants do not enjoy discretion to decide whether to devote sufficient resources to criminal departments to ensure speedy trials in criminal cases. Section 1050(a)—like the city charter in *Schaefer v. Berinstein, supra*, and the statute in *Miller v. McKinnon, supra*—requires them to do so. (*Engram, supra*, 50 Cal.4th at p. 1151.) While carrying out this duty may require the exercise of judgment on issues such as resource allocation, rendering it an inappropriate subject of mandamus relief,[26] that does not confer on defendants any discretion to choose whether or not to satisfy this duty.

### 3. Plaintiffs' Taxpayer Claim Is Distinct from Individual Defendants' Motions under Sections 1049.5 and 1382

Defendants also assert that if the cause of action is permitted to proceed, the relief sought here threatens to "intersect with" rulings on speedy trial motions in specific cases. They predict that judges will "either be

---

[25] In the other cases defendants cite, courts denied taxpayers standing to challenge a commission's exercise of discretion "in deciding whether to report information concerning possible criminal conduct by judges to prosecutors" (*Chodosh, supra*, 81 Cal.App.5th at p. 268) and an arts commissioner's exercise of "discretion to remove works of art [from city land] that did not fit the Commission's vision" (*Schmid, supra*, 60 Cal.App.5th at p. 496). In those cases, too, the official enjoyed discretion to choose, on policy grounds, whether or not to perform the act at issue, and *that choice* (not the manner in which it was carried out) was held immune to taxpayer challenge.

[26] That exercise of judgment, which was recognized in *Engram, supra,* 50 Cal.4th at page 1146, is why the trial court, in this case, relied on *Engram* to hold that a trial court's duty to allocate courtrooms "is a matter of discretion" that is "anything but 'ministerial' " in the sense *required for mandamus relief*. (See *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 593 [ministerial duty is one that must be "performed in a prescribed manner under the mandate of legal authority without the exercise of discretion or judgment"].) The fact that the duty is not ministerial, as would support a writ of mandate, does not mean it is not mandatory.

precluded from making a 'good cause' finding under circumstances presented in their individual actions or violate an order in [this] action that . . . a criminal defendant's speedy trial rights already have been abrogated." However, plaintiffs' complaint disclaims any request for relief affecting particular cases and, as the Supreme Court held in *Engram*, the case-specific, discretionary, "good cause for delay" determination under section 1382 is distinct from the general question of whether defendants have complied with a mandatory duty imposed by section 1050(a). (*Engram*, *supra*, 50 Cal.4th at p. 1160.) Defendants evidently do not accept that aspect of *Engram*, but we are not at liberty to treat the questions as interchangeable.

Nor have defendants shown how a judgment declaring courtwide policy decisions to be in violation of duties imposed on the court by section 1050(a) would interfere with or predetermine rulings on speedy trial motions in individual criminal cases. Such a finding would be, at most, one of several considerations in resolving such a motion. The prosecution still could show good cause for delay in a given defendant's case, based on the specific facts and history specific to that case (other factors contributing to the delay, the length of the delay, and prejudice, or lack thereof, caused by any continuance) which would not be the same facts considered in connection with the section 1050(a) taxpayer claim in this case.

Defendants also take the position that enforcement of the speedy trial provisions can occur only in defendants' individual criminal cases. At oral argument, they went so far as to argue that even a clear violation of the duty to prioritize criminal matters—for example, a decision to conduct criminal trials only every other year—could not be challenged by taxpayers, but only by directly impacted criminal defendants in their individual cases. Defendants cited no authority for this extreme ipse dixit, which contravenes

33

the express purpose of section 1050(a) to protect not only the rights of criminal defendants, but the right of "the people, the defendant, and the victims and other witnesses . . . to an expeditious disposition" of criminal cases. (§ 1050(a).) This argument also flies in the face of the evident intent of section 1050(a) to mitigate an array of "adverse consequences" caused by trial delays, including not just hardships experienced by the participants in individual criminal cases, but also broader social ills, including *undesirable impacts on the public health and fisc. (Ibid.* [observing that "excessive continuances" contribute to "overcrowding and increased expenses on local jails"].) It would therefore undermine the legislative intent behind section 1050(a) to bar taxpayers from enforcing the duties "enjoined upon" defendants by that provision for the benefit of all segments of society.[27]

---

[27] Defendants also seem to suggest that the mere existence of many cases that have passed their "last date" for trial, itself, cannot prove that defendants shortchanged the criminal caseload in violation of section 1050(a) without an inquiry into the individualized circumstances of every such case, to determine whether there was no good cause for delay. There is some irony in this argument, given plaintiffs' allegation (which we must credit) that defendants systematically bypassed this very same inquiry by developing and circulating a "good cause" script to utilize as the sole basis for numerous continuances. More importantly, as we have noted, defendants conflate two analyses which are conceptually and legally distinct (*Engram, supra,* 50 Cal.4th at p. 1160) (see p. 21, *ante*), and section 1050(a) protects rights and interests of the public, in addition to those of individual criminal defendants (see pp. 15–16, *ante*). Finally, we also consider that once a case has reached its statutory "last date," the time to commence trial can be extended (or a motion to dismiss denied) only upon an affirmative showing of good cause. (§§ 1049.5, 1382.) In other words, even in an individual case, the court presumes there is a speedy trial violation unless the People can demonstrate otherwise. (See also Cal. Rules of Court, rule 4.113 [motion to continue trial of criminal case will be denied unless moving party "presents

Finally, like the trial court, we reject defendants' related argument that plaintiffs lack taxpayer standing because criminal defendants may assert their own speedy trial rights. It is plainly without merit. (See *Spitzer*, *supra*, 53 Cal.App.5th at pp. 406–407 [" 'taxpayers may maintain an action under [Code of Civil Procedure] section 526a to challenge an illegal expenditure of funds even though persons directly affected by the expenditure also have standing to sue' "]; accord, *Van Atta v. Scott* (1980) 27 Cal.3d 424, 447–448 & fn. 21 [citing seven precedents, "Numerous decisions have affirmed a taxpayer's standing to sue despite the existence of potential plaintiffs who might also have had standing to challenge the subject actions or statutes"].)[28]

**e. Defendants' Challenges to the Sought-After Relief Lack Merit**

Defendants also contend that the trial court erred in declining to consider their challenge to certain types of relief because a demurrer does not lie to a form of relief, only a cause of action. Defendants assert that because they demonstrated that *every* form of relief sought in the complaint seeks is

---

affirmative proof in open court that the ends of justice require a continuance"].) In some instances, then, a speedy trial violation could be found without any inquiry into case-specific circumstances.

[28] As they did below, defendants cite *Dix v. Superior Court* (1991) 53 Cal.3d 442 (*Dix*), for the proposition that nonparties lack standing to challenge rulings in individual criminal cases. *Dix* held that a crime victim lacked standing to seek a writ of mandate to stop a court from resentencing the defendant. (*Id.* at pp. 447–450.) *Dix i*s plainly irrelevant, as the trial court explained, "because it involved an effort . . . to compel a particular outcome in a [specific] criminal case, which [plaintiffs] specifically foreswear." (See *id.* at p. 454, fn. 7 ["nothing we say here affects *independent* citizen-taxpayer actions raising criminal justice issues"].)

barred by law, the demurrer should be sustained. As we explain, defendants have made no such showing.[29]

First, defendants contend declaratory relief is not available because this case presents "no actual controversy upon which declaratory relief can be granted" as required by Code of Civil Procedure section 1060. They do not, however, clearly develop this argument, which we surmise rests upon the plaintiffs' disclaimer of any intent to challenge specific speedy-trial rulings in individual criminal cases; or upon plaintiffs' lack of a direct, personal interest in those rulings (as opposed to their general interest, as taxpayers, in ensuring the lawful and complete performance of the court's duties).

Such an argument reflects a fundamental misunderstanding of the taxpayer standing doctrine, which exists to enable citizens who have not suffered particularized injury to nonetheless enforce legal duties protecting the general public: " 'As a general principle, standing to invoke the judicial process' " requires that a plaintiff have " 'suffered or is about to suffer an injury,' " but "the concept of standing . . . has been considerably relaxed by [Code of Civil Procedure] section 526a," under which " ' "no showing of special damage to the particular taxpayer [is] necessary" ' for the taxpayer to prevent injury to the public." (*Chiatello v. City and County of San Francisco* (2010) 189 Cal.App.4th 472, 480–482.) It is thus well recognized that so long as a plaintiff alleges a statutory taxpayer claim, the action "presents a true case or controversy." (*Blair, supra*, 5 Cal.3d at p. 269 [in case involving

---

[29] While injunctive relief features prominently in the complaint and defendants' responding brief on appeal, at oral argument plaintiffs' counsel explained that plaintiffs primarily seek *declaratory* relief and will seek injunctive relief only "if necessary" (presumably, if defendants were to fail to comply with any resulting declaratory judgment). Thus, we focus primarily on the demand for declaratory judgment.

demand for injunctive relief, observing "[i]f we were to hold that [statutory taxpayer actions] did not present a true case or controversy unless the plaintiff and the defendant each had a special, personal interest in the outcome, we would drastically curtail their usefulness as a check on illegal government activity"]; *Kawaichi*, *supra*, 53 Cal.App.3d at p. 463, fn. 2 [applying same principle to declaratory relief].)

Defendants also contend declaratory relief is not available to settle the "rights of third parties," citing *Connerly v. Schwarzenegger* (2007) 146 Cal.App.4th 739 (*Connerly*). In *Connerly*, plaintiff sought to preclude enforcement of a provision which barred private parties from filing suit to challenge certain anti-discrimination measures. (*Id.* at p. 742.) The court held declaratory relief was unavailable against the Governor and Attorney General because they had no control over private persons' ability to file suit. (*Id.* at pp. 742–743.) Here, plaintiffs seek a declaratory judgment as to whether *defendants' own resource-allocation decisions* satisfied duties expressly imposed upon them under, inter alia, section 1050(a) or, as we discuss below (see pp. 39–40, *post*), whether the distribution of a "generic script" to facilitate "good cause" findings without a bona fide hearing violated the requirements of section 1049.5 and 1050(b)–(i).

Having concluded that plaintiffs have adequately pleaded a right to declaratory relief, we need not address defendants' challenges to injunctive relief, but observe as follows: First, defendants erroneously contend that plaintiffs must demonstrate particularized, individual injury to themselves to obtain injunctive relief under Code of Civil Procedure section 526a. As was stated unequivocally in *Blair*, " [I]t has never been the rule in this state that the parties in suits under [Code of Civil Procedure] section 526a must have a personal interest in the litigation. We specifically stated in *Crowe v. Boyle*

37

[(1920)] 184 Cal. 117, 152 that 'no showing of special damage to the particular taxpayer has been held necessary.' " (*Blair, supra,* 5 Cal.3d at pp. 269–270.)

Second, defendants claim that *Connerly* held that "[w]ithout a threat of present or future injury, no injunction can lie." (*Connerly, supra,* 146 Cal.App.4th at p. 751) This selective quotation, however, is outright misleading. In fact, the Third Appellate District held that the general rule (requiring a party to show particularized injury to obtain an injunction) *does not apply* in a statutory taxpayer action, "which allows a taxpayer the right to bring an action *to restrain* an illegal expenditure of public money *without a showing of special injury.*" (*Id.* at p. 749, italics added.)[30]

Defendants similarly mischaracterize the holding of *White v. Davis* (2003) 30 Cal.4th 528. In that case, the Supreme Court held that "a taxpayer's general interest in not having public funds spent unlawfully . . . , *while sufficient to afford standing to* bring a taxpayer action under Code of Civil Procedure section 526a *and to obtain a permanent injunction* after a full adjudication on the merits, ordinarily does not in itself constitute the type of irreparable harm that warrants the granting of *preliminary* injunctive relief."

---

[30] The plaintiff in *Connerly* sought a declaration that a statute was unconstitutional and an injunction to bar state officers from enforcing it. (*Connerly, supra,* 146 Cal.App.4th at p. 742.) While the case was pending, a final decision in another case held the statute unconstitutional, making it "for all purposes, invalid and unenforceable." (*Ibid.*) *Connerly* held that, at that point, the plaintiff ceased to have taxpayer standing and could no longer pursue an injunction—not for lack of particularized injury to himself, but because he could not allege that defendants planned to waste public funds trying to enforce a statute that had already been declared void. (*Id.* at pp. 749–751.) Thus, he could no longer allege a threat of injury " 'to the public fisc.' " (*Id.* at p. 749, italics omitted.)

(*Id.* at pp. 556–557, italics added.) Neither of these cases preclude injunctive relief on the facts pleaded in plaintiffs' complaint.

Finally, defendants assert that injunctive relief is unavailable "because courtroom utilization implicates security concerns for which the San Francisco Sheriff has responsibility." Even if this might ultimately limit the scope of available relief, defendants do not show that, as a matter of law, the court will be unable to fashion effective relief in the sheriff's absence.

### f. Claims Based on Sections 1049.5, 1050(b)–(i) and the Constitution

Although the viability of the section 1050(a) theory compels reversal of the judgment, to provide guidance on remand, we briefly assess plaintiffs' other theories of recovery, namely, that defendants violated duties enjoined by section 1049.5 and constitutional speedy-trial provisions.

Section 1049.5 requires a court in a felony case to set a trial date within 60 days of the defendant's arraignment "unless, upon a showing of good cause as prescribed in section 1050, the court lengthens the time," and in such a case requires the court to "state on the record the facts proved that justify its finding." (§ 1049.5.) Section 1050, subdivisions (b) to (i), which govern continuance motions, require specific evidentiary support, both in the movant's request (§ 1050, subd. (b)) and, if the request is granted, in the court's order on the record (§ 1050, subd. (f)).

Plaintiffs allege that, "instead of convening the hearings" required by sections 1049.5 and 1050 and "resting its good cause determination on affidavits and declarations," defendant court "routinely continues felony trials for months at a time, relying only on a generic 'good cause' script." This would appear to state a second, substantive basis for a taxpayer claim. Although individual judges rule on speedy trial motions pursuant to sections 1049.5 and 1050 in individual criminal cases, plaintiffs' claim focuses on the

39

role of defendant court and the defendant presiding judge in structuring and supervising that process. (Cf. Cal. Rules of Court, rule 4.115.) If plaintiffs can prove defendants disseminated to defendant court's judges a generic continuance "script" for use *in lieu of* (not merely in aid of) compliance with the procedural requirements of sections 1382, 1049.5 and 1050(b) to (i), they may prove defendants violated independent duties to enact policies and practices designed to avoid delays and statutory dismissals, and instead actively facilitated and sanctioned the violation, *en masse*, of underlying statutory procedural requirements governing speedy trial motions.[31]

Unlike plaintiffs' section 1050(a) theory of liability, this theory implicitly challenges, if not the merits of trial judges' rulings in various individual criminal cases, then the procedural foundation for those determinations. Further, although plaintiffs disclaim any request for relief in any individual criminal case, criminal defendants in pending cases (i.e., those in which the trial court relied solely upon its recitation of the generic script in denying a motion to dismiss under section 1382) could conceivably seek to rely on findings or orders in this action to obtain new or different rulings in their criminal cases. It is well-established, however, that neither of these circumstances preclude a taxpayer standing claim. In *Wirin v. Parker, supra,*

---

[31] We are aware of the recent observation by our colleagues in Division One that, "[g]iven the hundreds of cases in which defendants had not waived time, a boilerplate order setting forth the background of the COVID-19 pandemic and [defendant] court's response was not only within the trial court's discretion, but a time-efficient way of addressing motions to dismiss." (*Estrada*, *supra*, 88 Cal.App.5th at p. 1118.) We agree that it is permissible to utilize, in orders resolving motions to dismiss, boilerplate language reflecting general, judicially noticeable facts regarding the pandemic and the court's response. However, we do not read *Estrada* to endorse a trial court's use of a generic script to avoid fulfilling its statutory duties to receive, consider, and base its ruling on case-specific facts and evidence (§ 1050, subds. (b)–(i)).

48 Cal.2d 890 (surveillance program alleged to violate Fourth Amendment), *Spitzer*, *supra*, 53 Cal.App.5th 391 (confidential informant program alleged to elicit confessions in violation of constitutional rights), and *Van Atta*, *supra*, 27 Cal.3d 424 (pretrial-release program alleged to deny due process of law), courts affirmed taxpayers' ability to challenge the constitutionality of an alleged policy or pattern of official conduct, even though the challenges might implicitly undermine the propriety of past rulings or provide a basis to seek future relief in specific cases.

In *Spitzer,* the defendants challenged a taxpayer suit to enjoin a confidential-informant (CI) program that allegedly elicited confessions by unconstitutional means "because it will interfere with other pending criminal cases and thus fall afoul of the rule of exclusive concurrent jurisdiction." (*Spitzer*, *supra*, 53 Cal.App.5th at p. 405.) Rejecting that claim, the Fourth Appellate District noted that the court in the taxpayer action "will not be required to make a ruling [regarding any specific confession or criminal case] in a way that poses a risk of inconsistent directives." (*Ibid*.) But even if "two departments . . . may form different legal opinions about the legality of the CI program . . . [,] that sort of risk is inherent in judicial systems, like ours, that do not adhere to horizontal stare decisis. That is not a sufficient basis to deny plaintiffs standing . . . ." (*Spitzer, supra,* 53 Cal.App.5th at pp. 406–407, citing *Van Atta*, *supra*, 27 Cal.3d 424 [permitting taxpayer suit challenging pretrial release system].) We agree.[32]

---

[32] Plaintiffs have not shown how they can prove violations of the constitutional provisions guaranteeing criminal defendants' rights to a speedy trial in a way that is distinct from their theories grounded in sections 1050(a) and 1049.5 and will not entail challenging the rulings in individual criminal cases. However, because their complaint states a cause of action under other legal theories, we must reverse the judgment dismissing that cause of action. (*Amy's Kitchen, supra,* 83 Cal.App.5th at p. 1067.)

In any event, as we have noted throughout, the complaint expressly disclaims any intent to "challenge or seek to remedy any order in any particular criminal case" or to "seek dismissal of any case." On remand, we trust the trial court will manage the proceedings accordingly.

## Disposition

The judgment of dismissal is reversed and the matter is remanded for further proceedings consistent with this opinion. Plaintiffs shall recover their costs on appeal.

WHITMAN, J.[*]

WE CONCUR:

STREETER, Acting P. J.
GOLDMAN, J.

---

[*] Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

42

Trial Court:        Superior Court of California, County of Contra Costa

Trial Judge:        Hon. Edward G. Weil

Counsel:            Olivier & Schreiber, Monique Olivier, Christian Schreiber;
                    Miller Shah, James E. Miller and Casey T. Yamasaki for
                    Plaintiffs and Appellants.

                    Clyde & Co, Alison K. Beanum, Douglas J. Collodel, and
                    Kevin R. Sutherland for Defendants and Respondents.